# IN THE COURT OF APPEALS OF IOWA

No. 17-0452
Filed September 27, 2017

**MARC RUDEN,**
Plaintiff-Appellee,

**vs.**

**KYRA PEACH,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Dubuque County, Monica L. Ackley, Judge.

Kyra Peach appeals the district court's judgment on Marc Ruden's petition to establish paternity, custody, visitation, and support of their child. **AFFIRMED AS MODIFIED, AND REMANDED WITH DIRECTIONS.**

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

Jamie A. Splinter of Splinter Law Office, Dubuque, for appellee.

Considered by Vaitheswaran, P.J., and Doyle and Bower, JJ.

**DOYLE, Judge.**

Kyra Peach appeals the district court's judgment on Marc Ruden's petition to establish paternity, custody, visitation, and support of their child. She contends granting her physical care of the child is in the child's best interests. Both parties request an award of appellate attorney fees.

**I. Background Facts and Proceedings.**

Kyra met Marc when she interviewed for an internship with Marc's employer, IIW Engineering. The part-time internship began in January 2014. At the time, Kyra was a student in an engineering program and was in a relationship and living with Jeremy Peach. Marc was married.

After Kyra earned her engineering degree in the spring of 2014, she moved to Dubuque, where she lived with Jeremy and began working full-time at IIW. IIW assigned one of its employees to act as Kyra's mentor. After that employee left the company, IIW assigned Marc to be Kyra's mentor. Because her work went through Marc, Kyra viewed him as her boss.

Marc began to pursue and initiated a romantic relationship with Kyra. They began an affair sometime during the summer of 2014. Kyra ended her relationship with Jeremy. By October, the affair ended. Kyra resumed her relationship with Jeremy, and they became engaged to be married. Marc and his wife separated and eventually divorced.

After the affair ended, Kyra learned she was pregnant and informed Marc. Initially, the two maintained a friendly relationship, but Kyra perceived Marc to be persistent in his attempts to resume a romantic relationship with her, which made her uncomfortable at work. After IIW assigned Kyra a new mentor, she believed

Marc began to treat her differently in the workplace. She resigned from IIW in February 2015 due to the tension and stress she felt at work. Marc did not contact Kyra after she left IIW.

Marc filed a paternity action shortly before the child's June 2015 birth. Because Kyra and Jeremy were planning to marry in July, Kyra gave the child Jeremy's surname, which Kyra also assumed upon marrying him. Initially, the child's birth certificate did not name the child's father, though Kyra later had Jeremy's name added as the child's father. Paternity testing eventually established that Marc is the child's father.

Marc began having visits with the child in July 2015. In September 2015, the district court entered a temporary order placing the child in Kyra's care and providing Marc visits with the child each Tuesday and Thursday, as well as alternating weekends. After Kyra was hired as a wastewater engineer in Baraboo, Wisconsin, she sought permission to relocate the child to Wisconsin and to modify the temporary visitation schedule to accommodate her anticipated move.

Marc wanted extended visits with the child, including overnight visits. Because Kyra was practicing attachment-style parenting, including breastfeeding and co-sleeping, she opposed overnight visits until the child was older but agreed to lengthen Marc's daytime visits. After a hearing in April 2016, the court modified temporary custody and visitation to alternate care of the child between the parties for three consecutive nights at a time.

The matter came to trial in November 2016, and the district court entered its judgment the following month. The court placed the child in Marc's physical

care and continued the three-day rotation of custody between the parties until the child reached the age of three, at which point Kyra was granted visitation on alternating weekends and an overnight visit every Wednesday. Also, once the child reached age three, "if either parent is intending to take the child on an extended vacation, they shall be entitled up to seven days of uninterrupted time for **out-of-town travel** each month of the summer, which are June, July and August (first two weeks only.)" (Emphasis in original.) Kyra filed a motion seeking to enlarge and amend the court's findings and modify its judgment, the bulk of which the court denied.

**II. Scope and Standard of Review.**

We review the district court's custody determination de novo. *See Mason v. Hall*, 419 N.W.2d 367, 369 (Iowa 1988) (stating the appellate court reviews custody determinations made in paternity actions de novo). Although we may give the district court's fact finding weight, they are not binding on us. *See Phillips v. Davis-Spurling*, 541 N.W.2d 846, 847 (Iowa 1995). This includes credibility findings. *See id.*

Kyra argues this court should not defer to the district court's findings concerning the parties' credibility, claiming the court's "implicit bias against Kyra is evidenced from the trial record and the court's ruling." She cites a portion of the court's findings of fact in which the court found Kyra's claim Marc created a hostile work environment at IIW were not credible. The district court's adverse credibility finding was based, in part, on purported exhibitionist behavior by Kyra during a break in the trial.

Kyra filed a motion asking the district court to enlarge and amend its fact findings. In it, she complained about the court's reliance on "ex parte extrajudicial resources" in its findings, explaining:

> The court's reference to [Kyra] being seen by court personnel during a break in the trial is not on the record. The court did not bring the incident to the attention of the parties or their counsel during the trial. [Kyra] has not had a chance to rebut the court's allegations. [Kyra] and her attorney were not aware of these allegations until they read the Judgment filed December 21, 2016. The statement made by the court is inflammatory, not based on the trial record, and should not be considered by the court as it came from an ex parte extrajudicial resource. [Kyra] requests that the sentence, "In fact, during one of the breaks in the trial, she was seen by court personnel in the courtroom with her shirt up and her breasts exposed" be deleted from the Judgment and not considered by the court.

In denying Kyra's request, the district court asserted it "has the ability to make observations of everything that goes on in the courthouse during a trial." The court asserted that it carefully watched the parties conduct toward each other, their attorneys, and their witness. Based on these observations, the court concluded:

> [Kyra]'s conduct during the trial once again shows her complete disregard for those around her. While the break occurred when the observations were made of [Kyra], there were male workers within the courthouse and the courtroom maintaining the new heating and cooling system. They had been walking in and out of the courtroom, and this fact was very clear to all within the courtroom. That was the reason the issue was raised with the court. In fact, [Kyra]'s attorney was in the courtroom when her conduct occurred.

It is well settled that a factfinder may "take into account the conduct and appearance of the witness on the witness stand" in determining the facts. *See Bauer v. Reavell*, 260 N.W. 39, 47 (Iowa 1935). A witness's demeanor while testifying—as perceived through the witness's "carriage, behavior, bearing,

manner and appearance"—is part of the evidence, and factfinders "may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness." *Dyer v. MacDougall*, 201 F.2d 265, 268-69 (2d Cir. 1952). However, the court here went beyond its observations of Kyra during her testimony—and even during the course of the trial. The conduct cited by the trial court, though alleged to have occurred in the courtroom, took place outside of trial altogether. By relying on conduct outside the record in making its credibility determination, the court became a witness. *See Kovacs v. Szentes*, 33 A.2d 124, 125-26 (Conn. 1943) (stating the trial court, by reciting its observation of the parties and their conduct during trial in its findings, made itself an unsworn witness to material facts without the defendant having any opportunity to cross-examine, offer countervailing evidence, or know upon what evidence the decision would be made); *Dworkis v. Dworkis*, 111 So. 2d 70, 74 (Fla. Dist. Ct. App. 1959) ("The effect of a trial judge's observation of a party's manner and demeanor in the court room should be limited to its bearing on the credibility to be accorded to the party's testimony given under oath; and such observations by the judge should not be the basis for findings by the court on disputed facts, to the contrary of that party's position, because in so doing a judge may be said to have made himself a witness, unsworn and not cross-examined."). A judge cannot function as a witness because it is inconsistent with the impartiality expected of the court. *See* Iowa R. Evid. 5.605; *State v. Gardner*, 661 N.W.2d 116, 118 (Iowa 2003) (noting a judge may function as a witness without actually taking the stand to testify).

> [I]t runs against the grain of fairness to say that the same judge may consider his own crucial testimony and recollection rebutting petitioner's claim and simultaneously pass upon the credibility of all witnesses in weighing the evidence. A member of the judiciary has no peculiar competence in factual recollection of unrecorded events. . . . A party should be permitted to test a judge's recollection, as a witness presenting factual material testimony, as he would any other witness upon cross-examination.

*Id.* (quoting *Tyler v. Swenson*, 427 F.2d 412, 415 (8th Cir. 1970)).

We further note that the conduct the court relied on in making its credibility determination took place outside the presence of the court itself. Rather than basing its determination on behavior it witnessed directly, the court cited an out-of-court statement of an unknown declarant made outside of the record, the presence of the parties, and the presence of their attorneys. Because the statement itself is not contained in the record, there is no explanation beyond the court's vague summary as to what allegedly occurred. We have no context for the behavior alleged.[1] Under these circumstances, we have no basis for deferring to the court's credibility finding. In fact, as the statement relied on is not contained in the record, it would be improper for us to do so. *Cf. Hadley Mfg. Corp. v. Amalgamated Clothing Workers*, 108 N.L.R.B. 1641, 1644 (1954) (declining to adopt credibility findings when it could not be determined whether the determinations were made based on factfinders "objective appraisal of the demeanor of witnesses on the stand . . . or on other entirely irrelevant factors which are reflected in the injudicious statements appearing throughout" the

---

[1] Context is important. Even if the allegation is true and evidence of it had been included in the record, this court is aware of situations in which such conduct is acceptable. For instance, since 2000, Iowa law has permitted a woman to breastfeed her child in any public place where her presence is otherwise authorized. *See* Iowa Code § 135.30A (2015) (enacted by 2000 Iowa Acts ch. 1140, § 21). The presence of others during such an act—male or otherwise—would not support the credibility finding made by the district court.

factfinder's decision). *See generally Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1084-89) (9th Cir. 1977) (Duniway, J., concurring in part and dissenting in part) (outlining concerns regarding the reliability of credibility determinations that are based on a witness's demeanor).

**III. Child Custody.**

Our first and governing consideration in child custody cases is the best interests of the child. *See* Iowa R. App. P. 6.904(3)(o). The goal is to place the child in the care of the parent who is best able to minister to the child's long-term best interests. *See In re Marriage of Winter*, 223 N.W.2d 165, 166 (Iowa 1974). In making this determination, we consider the list of factors set forth in Iowa Code section 598.41, along with other relevant factors. *See* Iowa Code § 600B.40; *In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007). We seek to place the child in the environment most likely to foster physical and mental health, as well as social maturity. *See Phillips*, 541 N.W.2d at 847.

In determining what custody arrangement is in the child's best interests, the court must consider what arrangement

> will assure the child the opportunity for the maximum continuing physical and emotional contact with both parents . . . and which will encourage parents to share the rights and responsibilities of raising the child unless direct physical harm or significant emotional harm to the child is likely to result from such contact with one parent.

Iowa Code § 598.41(1)(a). A "significant factor" in determining custody is whether one parent has denied the child's opportunity for maximum continuing contact with the other parent without just cause. *See id.* § 598.41(1)(c). In addition, the courts have typically afforded weight to the parent who has acted as the child's primary caretaker in the past. *See Hansen*, 733 N.W.2d at 696-97

(noting the importance of affording children stability and continuity in determining custody).

The court's custody determination seems premised primarily on its belief that Kyra has obstructed Marc's relationship with the child. Though it acknowledged that Kyra has been the primary caregiver to the child, the court declined to give this factor any weight because it believed Kyra

> created a false reality in this role since she has made every effort to keep [Marc] from having the child in his care until the court ordered a schedule. She avoided his involvement prior to and at the time of her birth. She avoided it after the child was born. She gave in and allowed contact but only under her and her spouse's supervision.

We disagree with the court's findings.[2] It is clear that Kyra wished to raise the child with Jeremy without Marc's involvement and communicated as much to Marc. However, Marc initially agreed to this arrangement or, at least, conveyed to Kyra that he would honor her wishes. Marc never contacted Kyra after she quit IIW, and believing that Marc was surrendering any claim of paternity to the child, Kyra had no need to involve Marc in her life prior to the child's birth. It was not until she was served with the paternity action that Kyra had any indication that Marc's position had changed. Marc testified that in July, Kyra called to ask if she and Jeremy could bring the child to Marc's house for a visit, and Kyra continued to provide Marc with visits before the entry of the temporary visitation order.

---

[2] The district court's judgment is replete with instances in which we disagree with its characterization of the evidence. For instance, the court excoriated Jeremy for a history of drug use while characterizing Marc's act of driving "after drinking excessively," which resulted in his conviction for reckless homicide, as "an unfortunate accident that led to his incarceration." Rather than address each instance of disagreement, we address only those factors most relevant to the custody determination while undertaking our de novo review.

The district court faulted Kyra for attempting to move the child out of the state. In our independent review of the record, we find Kyra's attempt to move out of the state was motivated less by a desire to remove Marc from the child's life than by a desire to use her engineering degree to provide for her family when she was unable to find employment near Dubuque.[3]

The district court also faults Kyra by finding the temporary visitation schedule she agreed to "was of no benefit to [Marc] being able to bond with the child since the child napped most of the time during the visits." At the time the temporary visitation schedule was entered, the child was only a few months old. It appears that the child's sleep schedule was typical for an infant. There is no evidence to support a finding that the child's naps during those visits were a product of Kyra's design to attempt to prevent Marc from forming a bond with the child.

The record shows the parties have differing views on how to raise the child. Kyra firmly believes an attachment style of parenting will best serve the child's interests. Despite the myriad of evidence Kyra presented on the merits of this parenting style, the district court viewed it as another vehicle by which Kyra attempted to remove Marc from the child's life. Again, the record does not

---

[3] The district court stated it "suspects" that Kyra's difficulty in obtaining employment near Dubuque was due, in part, to the complaint Kyra filed with the Iowa Civil Rights Commission. Even assuming this is true, we note that the act of opposing unlawful treatment in the workplace by filing a civil rights complaint is a legally protected activity. *See* Iowa Code § 216.11(2) (prohibiting discrimination or retaliation against anyone who files a complaint under the Iowa Civil Rights Act). To attribute any fault to a complainant for difficulty in obtaining employment based on the act of filing a civil rights complaint would discourage others from opposing unlawful employment practices and would therefore be contrary to the purpose of the Iowa Civil Rights Act. *See Sommers v. Iowa Civil Rights Comm'n*, 337 N.W.2d 470, 473 (Iowa 1983) (noting one purpose of the Iowa Civil Rights Act is "to eliminate unfair and discriminatory practices in . . . employment" (quoting 1965 Iowa Acts ch. 121)).

support this finding. Although Kyra strongly opposed overnight visits with Marc at the child's age because it was contrary to her parenting style, she never interfered with Marc's overnight visits after the district court modified the temporary order. Moreover, Kyra testified that because the child had adapted to overnight visitation with Marc, she no longer opposed them.

Ultimately, we are presented with a choice between two parents who are each capable of providing appropriate care for the child. Looking at the record since the child was born, we find both parties are capable of cooperating to raise the child and supporting each other's relationship with the child, and we expect both parties will continue to do so. However, we must determine which parent is better able to minister to the child's best interests. On one side, we have Kyra and Jeremy, who have a long-term relationship and have been married since just after the child was born. Jeremy provides care for the child as a stay-at-home father while Kyra is at work. Kyra, who has practiced an attachment style of parenting, has been the child's primary caretaker and, as a result, has a close bond with the child. On the other side, we have Marc, who is unmarried but can rely on family members to care for the child while he works. The court's modified temporary order afforded Marc a more active role in caring for the child in the months leading up to the trial. However, on the record before us, we find Kyra is best suited to act as the child's physical caretaker. Therefore, we modify the judgment of the district court to place the child in Kyra's physical care. We remand to the district court to determine the issues of visitation and support based on the present circumstances.

**IV. Appellate Attorney Fees.**

An award of appellate attorney fees is discretionary. *See Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005). In determining whether to award appellate attorney fees, we consider "the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *Id.* (citation omitted).

We decline to award either party their appellate attorney fees.

**AFFIRMED AS MODIFIED, AND REMANDED WITH DIRECTIONS.**