# IN THE COURT OF APPEALS OF IOWA

No. 18-1810
Filed November 6, 2019

**MARK LEONARD MILLIGAN,**
        Petitioner-Appellee,

**vs.**

**OTTUMWA CIVIL SERVICE COMMISSION,**
        Respondent,

**and**

**CITY OF OTTUMWA and OTTUMWA POLICE DEPARTMENT,**
        Intervenors-Appellants.
_____

        Appeal from the Iowa District Court for Wapello County, Shawn R. Showers,

Judge.


        The appellants appeal from the district court ruling that reversed the

suspension and termination of Mark Milligan.  **REVERSED.**


        Jason M. Craig and Emily A. Kolbe of Ahlers & Cooney, P.C., Des Moines,

for appellants.

        Steven Gardner of Denefe, Gardner & Zingg, P.C., Ottumwa, for appellee.


        Heard by Bower, C.J., and May and Greer, JJ.

**GREER, Judge.**

Appellants Ottumwa Civil Service Commission (Commission), City of Ottumwa (City), and Ottumwa Police Department (Department) appeal from the district court ruling that reversed the suspension and termination of Sergeant Mark Milligan and awarded him back pay. The appellants argue Sergeant Milligan's suspension and termination were appropriate and the court erred by refusing to reduce his damages by income he received from other sources. We find Sergeant Milligan violated Department rules and uphold the suspension and termination. Given this determination, the damage question is moot. We thus reverse the ruling of the district court.

## I. Background Facts and Proceedings

On January 5, 2017, multiple law enforcement officials, including Officer Eric Orr and Sergeant Milligan with the Department, responded to a call about a potentially stolen car. At this scene, Sergeant Milligan was the supervising field sergeant and the highest ranking Department official. After the officers detained two individuals suspected of stealing the car, B.H., a juvenile who was not suspected of wrongdoing, approached Officer Orr and said she needed to retrieve her belongings from the car. Surveillance video and audio from Officer Orr's patrol vehicle shows these exchanges:[1]

> B.H.: May I please go get my shit [inaudible]
> ORR: Not yet.
> . . . .
> B.H.: Well, if you're going to tow [the car,] I need my shit.

---

[1] The following transcript comes from Officer Orr's patrol-vehicle camera. Multiple persons were at the scene and talking to each other. We have omitted irrelevant dialog here as "Cross-talk."

MILLIGAN: You keep running your mouth, things only get worse, [B.H.].

[Cross-talk]

ORR: Keep your mouth shut.

[Cross-talk]

B.H.: Who are you to tell me?

[Cross-talk]

ORR: Why don't you go over to the van and keep your mouth shut before you get in trouble.

[Inaudible]

ORR: Then go somewhere.  Go somewhere.

B.H.: In my opinion.

ORR: Go somewhere, because you are interfering right now and you're going to be arrested.

[Cross-talk]

B.H.: I need my shit.  I'm not leaving until I get my shit.

ORR: Well, you're not going to get it until we tell you you can.

[Cross-talk]

ORR: We'll take as long as we want.  It's going to take longer with your attitude.  We'll take all night long.

[Cross-talk]

B.H.: I can have my attitude [inaudible]

ORR: I'll put the stuff in the car into evidence and you can go get it . . . tomorrow if you want to continue.

B.H.: Evidence?

ORR: Yeah.  [Cross-talk]  I'll impound everything in that car.

MILLIGAN: [B.H.].

[Cross-talk]

ORR: Just flip me off.  I don't care.  I may get you for harassing a public official.  So keep it up.

B.H.: I'm not harassing.

ORR: You are too harassing me.

[Inaudible]

ORR: Did you just say you were going to beat my ass now?  Come here.  Did you just say—

[Inaudible]

ORR: Turn around.  You are under arrest now.  You just threatened to beat my ass.  You are under arrest.

Following this exchange, Officer Orr stated B.H. is "getting charged with harassing a public official because she threatened to beat my ass."  After placing B.H. in his police vehicle, Officer Orr and B.H. continued talking back and forth on the

transport to the police station. In the end, Officer Orr charged B.H. with assault on a police officer.

The next morning, noting a charge for assault on an officer and as a part of the routine, Lieutenant Chad Farrington performed a review of the incident. After examining the paperwork and surveillance video, he believed Officer Orr lacked probable cause for the arrest and engaged "in petty, unprofessional banter and argument" with B.H.[2] He sent a memorandum to Chief Tom McAndrew with his findings and recommended "an internal affairs investigation of this incident." Chief McAndrew then ordered a formal investigation into both Officer Orr and Sergeant Milligan.[3]

On January 19, Lieutenant Farrington interviewed Sergeant Milligan as part of the investigation. During the interview, Sergeant Milligan acknowledged he remained in his patrol vehicle throughout the encounter: "I just didn't take control enough to get the hell out of my vehicle. One, because it was colder than shit. Two, because I have a foot bothering the hell out of me lately." As a result, he "didn't get the gist of everything that was going on, you know . . . the details of the whole conversation" between Officer Orr and B.H. He also acknowledged that he and Officer Orr were the only two officials still at the scene at the time of B.H.'s arrest. As they watched video of the entire encounter, Lieutenant Farrington asked a series of questions:

---

[2] The county attorney eventually dismissed B.H.'s assault charge due to a lack of probable cause.

[3] The result of the investigation into Officer Orr is not in the record, though Chief McAndrew testified he ultimately "entered into a settlement agreement with [Officer Orr] so he could resign."

FARRINGTON: [W]e heard Officer Orr stating—go ahead and flip me off, I don't care. I'll arrest you for harassment of public official. In your opinion as a sergeant, do you believe Officer Orr had probable cause to arrest her for harassment of a public official?

MILLIGAN: At that point?

FARRINGTON: Yeah. At that particular point.

MILLIGAN: No. No, I don't think so. From what I've heard there, no.

. . . .

FARRINGTON: Have you—given the facts of that situation that night, had you been in a position to see where [B.H.] was, to see her hands, to see her clothing, to hear exactly the exchange just prior to this threat, then hearing a threat of, I ought to just beat your ass, and then seeing Officer Orr move around, as the field sergeant on duty that night would you have allowed him to arrest her for assault on a peace officer?

MILLIGAN: No. If I would have known all those facts, no.

. . . .

FARRINGTON: [D]oes it appear in certain ways that this was a contempt of cop[4] issue, in your professional opinion?

MILLIGAIN: Looking at what I know now, reference what I knew at the time?

FARRINGTON: Correct.

MILLIGAN: Yes. That's what it looks like on here. Is that the facts as I knew them at the time? No.

FARRINGTON: Had you known he was addressing and talking to this juvenile female in this manner, would you have taken any corrective action with him?

MILLIGAN: Definitely.

. . . .

FARRINGTON: Do you believe—have you—hindsight 20/20, had you exited your vehicle in particular when [Officer Orr] was going to make the arrest, that this situation could have changed?

MILLIGAN: Yes. Like I said, if I would have—well, I don't know. Because I don't know, like I said to explain before, I didn't hear the exchange. I didn't know the exact exchange or where everybody was at at this time. I just seen him move and go that direction. I don't know that it would have changed, other than I might have been in a better position to hear exactly what went on, you know.

---

[4] Earlier in the interview, Sergeant Milligan defined "contempt of cop" as, "if somebody pisses you off, you find a reason to take them to jail."

Upon completing his investigation, Lieutenant Farrington submitted a memorandum to Chief McAndrew summarizing his findings and concluding Sergeant Milligan violated Department Rule 2.5.[5] While reviewing the investigation, Chief McAndrew noticed the camera in Officer Orr's vehicle had recorded the following conversation in the police station after B.H.'s arrest:

> ORR: Do you know what sucks, Sarge? I waste more time doing stupid paperwork for this than what it's even worth, but it just, I just got sick and tired—
> MILLIGAN: You antagonizing her.
> ORR: I wasn't antagonizing her.
> MILLIGAN: Being some fucking super fucking stud. I'll show you, bitch. I'm telling you ain't going to fucking threaten me.
> ORR: You would have done the exact same thing. I've worked with you.
> MILLIGAN: I wouldn't either, because I was sitting in the car [inaudible].
> ORR: If you would have.
> MILLIGAN: I never got out of the car [inaudible]. I was warm.
> ORR: If you would have been in my shoes. If she would have—if you would have been in my shoes, if she would have looked at you and said fuck you, flipped you off, said I'm going to kick your ass, you would have arrested her too. I know you.
> MILLIGAN: Aww, come on, I'm too nice.
> ORR: Bullshit. I know you. And when you arrested her you probably would have bounced her head off the car or something. I know you well enough. I mean, do you think I shouldn't have or what?
> MILLIGAN: No. [Laughing] I was just. Big fucking meanie.

---

[5] Department rule 2.5 states:

Performance- Members shall perform their duties in a manner which shall maintain the highest standards of efficiency in carrying out the functions and objectives of the Department. Unsatisfactory performance may be demonstrated by a lack of knowledge of the application of laws required to be enforced; an unwillingness or inability to perform assigned tasks; a failure to conform to work standards established for the member's rank or position; a failure to take appropriate action on the occasion of a crime, disorder, or other condition deserving of police action.

Chief McAndrew provided the videos to Sergeant Milligan. He then held two *Loudermill* hearings[6] with Sergeant Milligan, in which Sergeant Milligan denied "develop[ing] any opinion that Officer Orr was antagonizing" B.H. prior to watching the videos with Lieutenant Farrington. On April 20, Chief McAndrew issued written disciplinary action (1) suspending Sergeant Milligan for fifteen days for violating Department Rule 2.5; and (2) terminating Sergeant Milligan for violating Department Rules 1.1[7] and 1.2.[8]

Sergeant Milligan appealed his discipline to the Commission, which proceeded to a hearing on June 19 and 20. He provided the following explanation for his conversation with Officer Orr at the police station:

> [I]t was all in a joking manner between myself and Officer Orr. I don't know if—you know, most people around the department here understand that me and Officer Orr were best friends, we hung out together all the time, we harassed each other, gave each other crap all the time. That's something that the—you know, is very common on patrol, we try to get a rise out of each other all the time, we do it in fun, we do it to, you know, just tease and, basically, you know, get under each other's skin, for whatever reasons.

He also restated he "did not form an opinion [of Officer Orr's conduct] that night." Following the hearing, the Commission fully affirmed the discipline. Regarding the suspension for violating Rule 2.5:

> The Commission finds that Milligan failed to properly supervise a junior officer during what became an emotional situation

---

[6] A *Loudermill* hearing is "a pretermination hearing that comports with the requirements of due process." *Bennett v. City of Redfield*, 446 N.W.2d 467, 472 (Iowa 1989) (citing *Cleveland Bd. of Educ. V. Loudermill*, 470 U.S. 532, 542 (1983)).

[7] Department rule 1.1 states: "<u>Truthfulness</u>- Members shall not lie, give misleading information, or falsify written or verbal communications. Members shall be accurate, complete, and truthful in all matters whether under oath or not."

[8] Department rule 1.2 states: "<u>Departmental Investigations</u>- Members are required to accurately and completely answer questions or render material and relevant statements in any internal and/or administrative investigation conducted by this or other authorized agency when so directed by the Chief of Police or his designated representatives."

when more effective supervision could have reduced the emotions of both the officer and the juvenile citizen.

The Commission finds that Milligan did not get out of his car, did not have his in-car camera on when the incident occurred, and the situation involving the junior officer, the juvenile and Milligan escalated to a situation that was not professional and would not have likely escalated if there had been proper supervision.

Regarding the termination for violating Rules 1.1 and 1.2:

The Commission finds that the statements offered at the Police Station on January 5, 2017, and the response to the investigations of Farrington and two hearings held by Chief McAndrew reveal that Milligan was not credible in explaining his impressions of the events on January 5, 2017. Milligan stated that Orr antagonized the juvenile and later denied that Officer Orr antagonized the juvenile. The Commission finds that Milligan was given the video and audio tapes that were reviewed by Chief McAndrew and had no explanation of the inconsistencies of his statements to the actions observed.

The Commission found termination "is harsh but . . . the actions of Chief McAndrew are not arbitrary and are based upon the standards communicated to Ottumwa Police Officers."

On June 30, Sergeant Milligan appealed the Commission's decision to the district court, naming only the Commission as respondent. After a hearing, the court issued its ruling on August 28, 2018, finding the disciplinary process "was harsh AND arbitrary from the time Chief McAndrew told Lieutenant Farrington to investigate Milligan." Accordingly, the district court reversed Sergeant Milligan's discipline and ordered him reinstated with back pay to April 20, 2017. The City and Department then intervened and moved to enlarge or amend the ruling, asking the court to reconsider its decision on Sergeant Milligan's discipline and reduce his damages by any income from other sources earned during the time of his

suspension.  On September 25, the court denied the motion in full.  The appellants now appeal.

## II.  Standard of Review

A city or employee may seek judicial review of a decision of a civil service commission under Iowa Code section 400.27 (2017).  Before 2017, judicial review of a commission's decision involved "a trial de novo as an equitable action in the district court."  Iowa Code § 400.27 (2015).  Under this statute, a district court hearing an appeal of a commission's adjudicatory decision would "try the case anew and give no weight or presumption of regularity to the findings of the [c]ommission."  *Sieg v. Civil Serv. Comm'n of the City of W. Des Moines*, 342 N.W.2d 824, 828 (Iowa 1983).

In 2017, the legislature deleted the language requiring a "trial de novo." 2017 Iowa Acts ch. 2, § 62.[9]  Applying the amended statute here, the scope of review on appeal is "de novo appellate review without a trial or additional evidence."  Iowa Code § 400.27(3) (2017).  "Trial de novo" and de novo review are distinct concepts.  *Sieg*, 342 N.W.2d at 828.  While the "trial de novo" standard allowed us to "give weight to the findings of the district court" after it tried the case anew, even with new evidence presented for the first time to the district court, a "de novo appellate review" standard requires we now place weight on the findings of the commission.  *Whitwer v. Civil Service Comm'n of City of Sioux City,* 897 N.W.2d 112, 118-19 (Iowa 2017).  Here, this trial court applied an inappropriate standard of review, concluding that it "*would give no weight to or presumption in*

---

[9] The change to Iowa Code section 400.27(3) became effective upon enactment: February 17, 2017.  2017 Ia. Legis. Serv. Ch. 2 (H.F. 291).

*favor of the commission's determination*." (Emphasis added.) In contrast, we apply the "de novo" standard that requires us to give weight to the findings of the commission, to review whether the sanction was warranted and restricts us to the record made at the commission level. *Dolan v. Civil Serv. Comm'n of the City of Davenport*, 634 N.W.2d 657, 663 (Iowa 2001).

### III. Issue for Review—Discipline

Finding the "*investigation* was harsh AND arbitrary" and that the process was "unjust," the district court determined both the 15-day suspension and the termination of employment to be impermissible. Thus, we begin with an analysis of appropriate discipline for persons with civil service rights. A civil service employee may be disciplined "due to any act or failure to act by the employee that is in contravention of law, city policies, or standard operating procedures, or that in the judgment of the [decision-maker] is sufficient to show that the employee is unsuitable or unfit for employment." Iowa Code § 400.18. That said, the employee may not be disciplined "arbitrarily." *Id.*; *see also City of Des Moines v. Civil Serv. Comm'n of Des Moines*, 540 N.W.2d 52, 58 (Iowa 1995) ("[A]n important purpose of Iowa Code chapter 400 . . . is to allow a discharged civil service employee an opportunity to challenge his or her discharge as arbitrary."). The primary objective of this process "is to protect the public interest." *Dolan*, 634 N.W.2d at 664.

### A. Bias

Focusing on the investigation, Sergeant Milligan asserts—and the district court agreed—Chief McAndrew held bias against him, rendering the entire investigation and ensuing discipline impermissibly arbitrary. *See* Iowa Code § 400.18(1). To establish bias, Sergeant Milligan urged four points related to Chief

McAndrew's bias: (1) as the district court noted, Chief McAndrew and Sergeant Milligan showed "palpable hostility" between them during hearings; (2) Sergeant Milligan has filed two lawsuits on unrelated matters naming the City and Chief McAndrew as defendants;[10] (3) Chief McAndrew personally instructed Lieutenant Farrington to investigate Sergeant Milligan; and (4) Chief McAndrew impermissibly relied on prior discipline to justify the suspension and termination here. Because of this bias, the court determined "it would have been more appropriate for" another person to act as the initial decision-maker in the investigation and discipline of Sergeant Milligan.

Without question, Chief McAndrew was well acquainted with Sergeant Milligan before the events of January 5, 2017. But the Iowa Code anticipates familiarity in these decisions as it grants the chief of police disciplinary power over the members of his or her department. *See id.* § 400.18(1) (allowing discipline for an act "that in the judgment of the person having the appointing power as provided in this chapter, or *the chief of police* or chief of the fire department, is sufficient to show that the employee is unsuitable or unfit for employment" (emphasis added)). Given this statutory grant, our concern is not whether "it would have been more appropriate for" someone else to decide Sergeant Milligan's discipline. Our concern is whether, under our "de novo appellate review," the record as a whole shows "arbitrar[y]" discipline of Sergeant Milligan. *See id.* §§ 400.18(1), .27(3);

---

[10] On September 12, 2016, Sergeant Milligan filed suit against the Department and City seeking to enforce his open-records request regarding traffic-camera citations. Even though this suit does not name Chief McAndrew, he testified at the Commission hearing that he considered himself part of the suit as the Department's representative. On September 16, 2016, Sergeant Milligan filed suit against Chief McAndrew alleging slander, unauthorized release of personal information, and violation of civil rights regarding Chief McAndrew's response to the first suit.

*see also Sieg*, 342 N.W.2d at 829 ("Taking the record as a whole, we cannot agree with the trial court's conclusion that Sieg's conduct was not detrimental to the public service."). Real or perceived bias in the initial decision-maker may be a factor in our determination, but Sergeant Milligan provides no authority—and we have found none—stating that this bias alone can reverse discipline under chapter 400. Even with the extensive discussion of the other unrelated litigation and arguable bias during the commission hearing, the fact finder appears to have appropriately reviewed the rules, the behavior, and the ultimate goal of protection of the public interest.

And we do not see such extensive evidence of bias in the record. First, the district court found "palpable hostility" between Chief McAndrew and Sergeant Milligan. To the extent the court observed hostility during the hearing before it, witness observations are outside the record in appellate review and cannot be considered.[11] *See* Iowa Code § 400.27(3); *accord Ruden v. Peach*, 904 N.W.2d 410, 413 (Iowa Ct. App. 2017) ("By relying on conduct outside the record in making its credibility determination, the court became a witness. A judge cannot function as a witness because it is inconsistent with the impartiality expected of the court." (citations omitted)).

To the extent that the court observed hostility during the *Loudermill* hearings, we have reviewed the same transcripts and audio, and we do not find that Chief McAndrew's questioning, while pointed, shows hostility or veered into behavior outside the sanction issue. Second, while Chief McAndrew personally

---

[11] Furthermore, we have no transcript or other record of the district court hearing to evaluate any hostility.

ordered the formal investigation of Sergeant Milligan, Lieutenant Farrington testified he first orally recommended to Chief McAndrew that he also investigate Sergeant Milligan's conduct. Additionally, we find nothing arbitrary about investigating Officer Orr and his supervisor Sergeant Milligan, as they were the only two officers on the scene at the time of B.H.'s arrest. We further note the investigation included interviews with the other officers who were potentially involved in the encounter and ensuing assault charge, and Chief McAndrew could have opened formal investigations into these officers as well if the investigation had uncovered additional misconduct. Third, Chief McAndrew relied on Sergeant Milligan's prior discipline—two written reprimands in 2014 for separate violations of Rule 2.5 and a third written reprimand in 2016 for violating a lesser rule—even though Department procedures require that written reprimands be purged from an employee's personnel file after one year. However, Chief McAndrew testified at the Commission hearing that he may look at conduct outside the personnel file and older than a year when imposing discipline. We agree and find it appropriate to consider Sergeant Milligan's prior discipline when imposing discipline here. *See City of Fort Dodge v. Civil Serv. Comm'n of the City of Fort Dodge*, 562 N.W.2d 438, 440 (Iowa 1997) (considering an officer's entire disciplinary history in determining the appropriate discipline for the current violation). Yet we recognize the lawsuits directly or indirectly naming Chief McAndrew as defendant at least raise the perception of bias. Even though Sergeant Milligan presents no direct evidence of retaliation, we will consider bias as we evaluate the arbitrariness of the discipline. We start with the suspension determination.

B. Suspension for violation of Rule 2.5[12]

The Commission found Sergeant Milligan violated Rule 2.5 on performance by failing "to properly supervise a junior officer during what became an emotional situation when more effective supervision could have reduced the emotions of both the officer and the juvenile citizen." Rule 2.5 requires officers to perform their duties at "the highest standards." As field sergeant, one of Sergeant Milligan's duties was to supervise officers in the field. Nevertheless, he admits he remained in his vehicle while Officer Orr and B.H. interacted and only heard pieces of their conversation. He asserts to us that he "remained in his vehicle because he was approached [by other officers and civilians] as soon as he arrived." However, in his interview with Lieutenant Farrington, he acknowledged he "just didn't take control enough to" exit his vehicle because of the cold and a pain in his foot.

We also note that at the time Officer Orr arrested B.H., the scene had cleared somewhat and they were the only two officers remaining. As an experienced law enforcement officer, Sergeant Milligan knew B.H. only wanted to retrieve personal possessions, observed the movement of Officer Orr towards her, and knew the outcome was an arrest. Yet, Sergeant Milligan claims no knowledge of the surrounding circumstances occurring on his watch. When interviewed, Sergeant Milligan agreed Officer Orr had no basis to arrest B.H. and he would have corrected Officer Orr if he had been fully aware of his conduct. Thus, we agree with the Commission that Sergeant Milligan violated Rule 2.5 by failing to provide proper supervision.

---

[12] During oral arguments, Sergeant Milligan's counsel conceded there was a violation of Rule 2.5.

The Commission affirmed a fifteen-day suspension for violating Rule 2.5. A fifteen-day suspension is the minimum suggested punishment for a third violation of Rule 2.5 under published Department procedures. Therefore, we agree with the Commission that a fifteen-day suspension is appropriate for Sergeant Milligan's violation of Rule 2.5.

C. Termination for violation of Rules 1.1 and 1.2

Rule 1.1 requires "accurate, complete, and truthful [statements] in all matters." Rule 1.2 requires officers "to accurately and completely answer questions or render material and relevant statements in any internal and/or administrative investigation." In its findings, the Commission determined Sergeant Milligan violated these rules by being untruthful in his investigation. Throughout the investigation and during the Commission hearing, Sergeant Milligan maintained he did not hear enough of the interaction between Officer Orr and B.H. to form an opinion on Officer Orr's conduct at the time. We acknowledge Sergeant Milligan could not have heard the conversation between Officer Orr and B.H. while he transported her to the police station, but it remains unclear how much of their conversation Sergeant Milligan heard prior to the arrest.[13] However, the surveillance video shows Sergeant Milligan was at least at times aware of—and at times actively participated in—the escalating interaction between Officer Orr and B.H. before the arrest. Claiming no knowledge, yet less than thirty minutes after the arrest, Sergeant Milligan teased Officer Orr for "antagonizing" B.H., mocking

---

[13] We note that—contrary to Department rules—Sergeant Milligan did not activate his in-vehicle camera during the interaction, which could have helped show what he said and heard.

him as "some fucking super fucking stud" for his interaction with her.[14]  Officer Orr then asked if he "shouldn't have" arrested B.H., but Sergeant Milligan declined to answer and mocked Officer Orr as a "[b]ig fucking meanie."  Sergeant Milligan characterizes his comments as "joking," but he does not explain how he could joke about Officer Orr "antagonizing" B.H. if he had no idea of the interaction between Officer Orr and B.H.  The Commission explicitly found he "was not credible in explaining his impressions of the events on January 5, 2017," and we give weight to this finding.  *See Sieg*, 342 N.W.2d at 828; *see also State v. Weaver*, 608 N.W.2d 797, 804 (Iowa 2000) ("Determinations of credibility are in most instances left for the trier of fact, who is in a better position to evaluate it.").  On our de novo review, we agree with the Commission that Sergeant Milligan violated Rules 1.1 and 1.2 by making untruthful statements during the investigation.

The Commission affirmed terminating Sergeant Milligan for violating Rules 1.1 and 1.2.  Department procedures suggest a range of discipline for a first violation of these rules, from a five-day suspension to termination.  At the Commission hearing, Chief McAndrew explained Rules 1.1 and 1.2 are "the top two rules" in the Department:

> The citizens of the community have the right to have officers who possess integrity, officers who have character, officers who will tell the truth.  It's in the public's interest to have officers who possess integrity.  And Sergeant Milligan gave up his integrity when he made these statements and he acknowledged that he knew the officer was antagonizing [B.H.] to the point that she was arrested.  So it's vitally important to our department and our mission that we have officers that tell the truth.  Integrity's the backbone of our—or bedrock of our department.  Once it gets out that we have just one officer that doesn't tell the truth, that he lies, it confirms—it brands the whole department as a bunch of liars.  It's no different than an officer who

---

[14] There can be no coincidence that the "banter" mirrored the actual events.

> uses excessive force. Once that's caught on video of that one officer using excessive force, we're all a bunch of people—the community brands us as officers who are—use excessive force on a regular basis even though it's just one person. So it's extremely important that these violations are handled in a very serious fashion.

Chief McAndrew also expressed concern about possibly being required to disclose Sergeant Milligan's dishonesty in this investigation if he were involved in future criminal prosecutions. We agree with Chief McAndrew and the Commission that termination is in the public's interest. Termination, while harsh, is appropriate discipline for dishonesty in an internal investigation. *See Sieg*, 342 N.W.2d at 829 ("Police departments are akin to paramilitary organizations, and discipline must be strictly enforced."). As a result, we affirm Sergeant Milligan's termination for violating Rules 1.1 and 1.2.

### IV. Damages

Having reversed the district court and affirmed the Commission's suspension and termination of Sergeant Milligan, we do not reach the appellants' argument he had a duty to mitigate damages.

### V. Conclusion

We do not find Sergeant Milligan was disciplined arbitrarily, and we agree with the Commission that a fifteen-day suspension and termination are appropriate for his violations of Department rules. We thus reverse the ruling of the district court. Having found he is not entitled to damages, we do not reach the question of whether his damages must be reduced by other income earned since termination.

**REVERSED.**