# IN THE COURT OF APPEALS OF IOWA

No. 22-0062
Filed September 21, 2022

IN RE THE MARRIAGE OF ELIZABETH KATHRYN ANDERSON
AND DARRICK MAURICE ANDERSON

Upon the Petition of
ELIZABETH KATHRYN ANDERSON, n/k/a ELIZABETH KATHRYN
SHECKELLS,
        Petitioner-Appellant,

And Concerning
DARRICK MAURICE ANDERSON,
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Samantha Gronewald,

Judge.


        A former spouse appeals the denial of her petition to modify the

physical-care provisions of a dissolution decree. **AFFIRMED.**


        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellant.

        Jaclyn M. Zimmerman of Miller, Zimmerman & Evans, P.L.C., Des Moines,

for appellee.


        Considered by Ahlers, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

In a stipulated decree dissolving their marriage, Elizabeth Sheckells and Darrick Anderson agreed their son should be placed in their joint physical care. Eighteen months later, Elizabeth petitioned to modify that arrangement so that she could move to Georgia to be with her new husband who was stationed there on military orders. The district court denied Elizabeth's request, finding her planned move was not a substantial change in circumstances.

Trying a different angle on appeal, Elizabeth now claims "Darrick's failure to participate in the responsibilities of [joint] physical care establishes that custodial arrangement has failed and is a substantial change in circumstances warranting a modification." Because we agree with the district court that Elizabeth did not prove the required change in circumstances, we affirm.

## I. Background Facts and Proceedings

Elizabeth and Darrick married in 2012. They had one child together—M.A., who was born in 2015. Elizabeth filed a dissolution petition in August 2018. Around the same time, she started using a dating app on which she met her current husband, John. They dated very casually at first since Elizabeth was still living with Darrick until their divorce was finalized in January 2019. Once Darrick moved out, Elizabeth's relationship with John became more serious. They got engaged during Memorial Day weekend in 2020 and married in June. The day before the wedding, Elizabeth petitioned to modify the divorce decree, citing her "planned move to the state of Georgia."

John is an active-duty member of the United States Marine Corps. He was stationed in Des Moines when he started dating Elizabeth. John is about four

years away from retiring with full benefits after twenty years of service. During his military career, John has been stationed in seven locations and had six overseas deployments. While he doesn't expect any further deployments, John is still subject to being moved to different military bases in the United States. Shortly after he married Elizabeth, John received orders to report for duty in Georgia. He moved there in August 2020, while Elizabeth remained behind in Iowa with M.A. At the time of the trial in November 2021, Elizabeth and John were expecting their first child together. They both said the situation has been "very tough" on them, emotionally and financially.

Elizabeth testified that she stayed in Iowa after John moved because of her caretaking arrangement with Darrick. The parties' stipulated dissolution decree placed M.A. in their joint legal custody and physical care. They crafted a parenting schedule around Darrick's variable hours as an air traffic controller.[1] Unless they agreed otherwise, Elizabeth was to have parenting time the last full weekend of each month, with Darrick having every remaining weekend from Friday at 2:00 p.m. to Monday at 12:00 p.m. and every Thursday from 2:00 p.m. until 7:30 p.m. M.A. was to be in Elizabeth's care the rest of the time unless Darrick asked to use what the parties called his "flex time," which allowed Darrick to exercise "up to six additional overnights each calendar month if he is able to bid off time or adjust his schedule to accommodate." If Darrick did not use the flex time, any unused days

---

[1] Darrick explained that when the stipulation was entered into, he had Saturdays and Sundays off. The rest of the week, he normally worked from 2:00 p.m. until 11:00 p.m. on Monday, noon to 9:00 p.m. on Tuesday, Wednesday from 9:00 a.m. until 5:00 p.m. or 10:00 a.m. until 6:00 p.m., Thursday from 6:00 or 7:00 a.m. until 2:00 or 3:00 p.m., and Friday from 5:30 or 6:00 a.m. until 12:30 or 1:00 p.m.

would "'carry over' to the summer" to be "added to his two weeks of summer parenting time . . . up to a maximum of seven additional days of summer parenting time."

According to Elizabeth, and a chart she kept, Darrick rarely used his six flex overnights per month. Darrick disagreed, testifying that he did request more time with M.A., but it was denied by Elizabeth. Darrick explained that when the pandemic started in March 2020, all of the air traffic controllers were moved to a five-day-on, ten-day-off rotation, with their shifts starting at 6:00 a.m. While this meant Darrick couldn't care for M.A. overnight when he was working, he had "ten days off after that so [he] could have had more time" then. But when he requested that time, Darrick said Elizabeth's "response was always no." In any event, Darrick typically used just one to two nights of his flex time with M.A. each month.

Because Darrick did not use all of his flex time, M.A. was primarily in Elizabeth's care during the week, which meant she attended to most of his routine daily needs like "packing the snacks, washing the masks, making sure that everything is ready to go, the homework is done, the appointments are made, [and] the prescriptions are refilled." Her flexible schedule as a market research manager was conducive to this. During the pandemic, Elizabeth was able to work remotely from home full-time and care for M.A. And when he returned to school on a hybrid schedule, Elizabeth was "able to rearrange [her] work around his schedule."

Once M.A. went back to school full time, the couple noticed he struggled some socially and behaviorally. After talking with Darrick, Elizabeth made arrangements to have M.A. assessed. He was diagnosed with "ADHD and low grade autism," resulting in an individual education program at school. Although

M.A. does well academically, he works with a special education teacher and participates in occupational therapy outside of school. As the district court noted, M.A. "has made significant improvements since he received his diagnosis and began services specialized to meet his needs." Both parents are involved in M.A.'s schooling and therapy, though Elizabeth has been more proactive in coordinating his appointments. They are also involved with scheduling and attending the child's various extracurricular activities.

In what the district court characterized as a "refreshing" change of pace, Elizabeth and Darrick were complimentary of one another as parents. And they worked together well for M.A.'s benefit. Both wanted to be the type of blended family where they would all be present "on the sidelines cheering for" their child. Elizabeth agreed at trial that but for her desire to move to Georgia to be with her husband, there was "no other reason to break the shared care arrangement." If her petition was not granted, Elizabeth testified she would stay in Des Moines and maintain the status quo. Elizabeth also said that if Darrick was able to move to Georgia, she would "absolutely" be okay with maintaining their current parenting arrangement. Darrick explored the possibility of transferring to an airport in the town where John is stationed, but there were no openings. He also looked at transferring to the Atlanta airport, but that would be about an hour-and-a-half drive to Elizabeth and John's home and require him to work six days a week.

Also weighing on Darrick's decision to remain in Iowa was that John's military orders in Georgia will end in August 2023, although he could be restationed as early as August 2022. John testified that it's likely he will have to move again as soon as he completes his current orders in Georgia. As of the time of trial, John

had no idea where his next orders would send him. Wherever it is, his next orders would be another three-year assignment "that would take [him] to retirement." Once he retires, John and Elizabeth testified they would likely return to Iowa if Darrick was still there because M.B. "needs to have that relationship with his dad and we are both sincerely committed to that in the long term."

In its modification ruling, the district court found the focus needed to be on M.A., stating that while it was "sympathetic to Elizabeth and John's current situation. . . . the [c]ourt cannot conclude Elizabeth's proposed move to Georgia would be in M.A.'s best interest. This is particularly true, given Elizabeth's willingness to remain in Iowa for his benefit." On the last point, the court determined that because "Elizabeth's desire to relocate is a conditional one," it was not a "change that is 'more or less permanent' and directly tied to M.A.'s welfare." In the end, the court concluded:

> M.A. is thriving under the joint physical care arrangement that has been in place since January 2019. Elizabeth and Darrick are excellent co-parents who, for the most part, have very little conflict in their relationship with each other. They both have strengths in their parenting styles that, when combined, facilitate an environment most likely to bring M.A. to health, both physically and mentally, and to social maturity. . . . M.A. is happy, is performing well academically, and has appropriate services in place to address his needs associated with his autism diagnosis. Continuation of the secure, stable, and quality home, school, and treatment environments created by Elizabeth and Darrick is in M.A.'s best interest, such that Elizabeth's request to modify physical care must be denied.

## II.    Standard of Review

An action to modify a decree of dissolution of marriage is an equitable proceeding, so our review is de novo. Iowa R. App. P. 6.907; *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). We give weight to the factual findings

of the district court, especially when considering the credibility of witnesses, but are not bound by them. Iowa R. App. P. 6.904(3)(g).

### III. Analysis

The first issue before us is whether there has been a material and substantial change in circumstances since the January 2019 decree that warrants modifying the joint-physical-care arrangement. *See Thorpe v. Hostetler*, 949 N.W.2d 1, 5 (Iowa Ct. App. 2020). As the parent seeking the modification, Elizabeth "face[s] a heavy burden in proving that modification is warranted" because "once custody of the child[ ] has been fixed it should be disturbed only for the most cogent reasons." *Id.* (citation omitted). "The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary." *Id.* (citation omitted). They must also "relate to the welfare of the child," such that the child's "best interests make it expedient to make the requested change." *Id.* (citation omitted).

The only change in circumstances that Elizabeth raises on appeal is her role as the primary caretaker since dissolution.[2] She argues "the shared care parenting did not evolve into roughly equal parenting as the parties and district court envisioned in the decree," so a substantial change in circumstances has occurred.

---

[2] Elizabeth did not raise this claim in district court, focusing instead on her marriage and desire to relocate as changes sufficient to warrant modification. As a result, the court did not address it. Yet the parties agree error was preserved. *Cf. Est.of Cawiezell v. Coronelli*, 958 N.W.2d 842, 848 (Iowa 2021) ("In order for error to be preserved, the issue must be both raised and decided by the district court." (citation omitted)). We elect to bypass any error preservation concerns and proceed to the merits. *See State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999).

It is true that if Darrick exercised all of the flex time provided for in the decree, the parties would have roughly equal time with M.A. But the decree contemplated the possibility that Darrick would be unable to use all of that time, providing that he "*may* exercise up to six additional overnights each calendar month *if* he is able to bid off time or adjust his schedule to accommodate." (Emphasis added.) The schedule developed by the parties anticipated that M.A. would typically be in Elizabeth's care during the week, which is when most of the parenting duties Elizabeth says she performs would normally occur. But it is not as if Darrick does not undertake those same duties. Elizabeth acknowledged that when M.A. is with Darrick, he does all of the same things that she does. Contrary to her assertions otherwise on appeal, Elizabeth agreed at trial that Darrick was an active and engaged father, attending the child's school conferences, extracurricular activities, medical appointments, and therapy sessions.

Given these facts, it is difficult to "see how the shared-care agreement[ ] ha[s] not evolved as envisioned by the parties." *See In re Marriage of Malloy*, No. 16-0274, 2016 WL 7404611, at *5 (Iowa Ct. App. Dec. 21, 2016) (denying mother's request to modify physical care where she claimed the father "has not actively tried to enforce" the joint-physical-care schedule). Also, "nothing has occurred that has made their agreement unworkable." *Id.* To the contrary, the parties are model co-parents—they communicate about the child effectively, respect one another's role in the child's life, and made the schedule work seamlessly for themselves and the child.

Modification from joint physical care is normally only appropriate "when 'shared custody provisions . . . incorporated into the decree have not evolved as

envisioned by either of the parties or the court" or when the parents simply "cannot cooperate or communicate in dealing with their children.'" *In re Marriage of Harris*, 877 N.W.2d 434, 441 (Iowa 2016) (quoting *In re Marriage of Walton*, 577 N.W.2d 869, 870 (Iowa Ct. App. 1998)). Neither circumstance is present here. What's more, the alleged change in circumstances does not affect the child's welfare. *See Thorpe*, 949 N.W.2d at 5. Rather, M.A. has thrived under the joint-physical-care arrangement that Elizabeth said she would continue were it not for her planned move to Georgia.

On that issue, while Elizabeth does not re-up her claim in district court that her planned move to Georgia is a substantial change in circumstances warranting modification, even if she had, we agree with the district court that it was not a permanent change or that modification would be in M.A.'s best interests. John testified that his orders in Georgia would not go beyond August 2023, at which point he would be subject to a move somewhere else for another three years, before another move at his retirement. Elizabeth and John hoped that final move would be to Iowa if Darrick were still living there. With those practical realities, as well as "Elizabeth's willingness to remain in Iowa for [M.A.'s] benefit," Elizabeth's proposed move would not be in M.A.'s best interests.

Like the district court, we are "sympathetic to Elizabeth and John's situation," but "[p]hysical care issues are not resolved based upon perceived fairness to the *spouses*, but primarily upon what is best for the *child*." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). We agree that continuing the "secure, stable, and quality home, school, and treatment environments" created by these commendable parents is what is best for this child. *See Ruden*

*v. Peach*, 904 N.W.2d 410, 414 (Iowa Ct. App. 2017) ("Our first and governing consideration in child custody cases is the best interests of the child.").

## IV.  Appellate Attorney Fees

Darrick passively requests an unspecified amount of appellate attorney fees.  An award of appellate attorney fees is not a matter of right but rests within our discretion.  *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007).  We consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal."  *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005).  Darrick earns a six-figure income, making his need for an award negligible.  While Elizabeth also makes a good living from her job, she was incurring a significant amount of expenses maintaining two homes and traveling to see John in Georgia, plus the added cost of her soon-to-be-born child.  We accordingly deny Darrick's request.

## V.  Conclusion

We affirm, concluding Elizabeth did not show a substantial change in circumstances warranting modification and the result of modification would be contrary to the child's best interests.  Darrick's request for an award of appellate attorney fees is denied.

**AFFIRMED.**