# IN THE COURT OF APPEALS OF IOWA

No. 21-1421
Filed November 17, 2022

**AUNDRE REDMOND WHITFIELD,**
　　Plaintiff-Appellee,

**vs.**

**CHELSEA R. CLAYTON,**
　　Defendant-Appellant.
_____

　　Appeal from the Iowa District Court for Webster County, Jennifer A. Miller,

Judge.


　　Chelsea Clayton appeals the physical care determination for her children

with Aundre Whitfield.  **AFFIRMED.**


　　Chelsea Clayton, Ankeny, self-represented appellant.

　　Dani L. Eisentrager, Eagle Grove, for appellee.


　　Considered by Schumacher, P.J., Chicchelly, J., and Carr, S.J.*

　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**CARR, Senior Judge.**

Aundre Whitfield and Chelsea Clatyon are the never-married parents of two children, born in 2016 and 2018. Additionally, Chelsea is the mother of T.C., born in 2011. Aundre and his fiancé also have a child together, born a few days before trial. The parties began living together in Fort Dodge in 2011, shortly after T.C. was born. The parties briefly separated and reconciled around the time their older child was born. The parties ultimately separated in 2018 shortly after their younger child was born.

Aundre filed the petition to establish custody, visitation, and support in July 2020. At the time of trial, Aundre lives in the same home in Fort Dodge that the parties lived in during their relationship. He works overnights, about 6:00 p.m. to 6:00 a.m., seven out of every fourteen days. He testified he sleeps during downtime at his job and he occasionally naps during the day. Chelsea moved to Ankeny in July 2021. She works more traditional hours, Monday through Friday from about 8:30 a.m. to 4:30 p.m. After a trial in August 2021, the district court granted joint legal custody, placed physical care with Aundre, ordered visitation with Chelsea on every other weekend, and established Chelsea's child support obligation. The court provided the following explanation for its physical care determination:

> Aundre's current employment allows him to be home with the children during the day and he does not need to utilize daycare. Aundre and the children also have a large family support system in Fort Dodge which includes not only Aundre's family but Chelsea's family as well, all of whom can assist with care of the children if necessary. The children have lived in their home in Ft. Dodge their entire lives, [the older child] has started to attend school in Ft. Dodge, and the children have medical providers established in Ft. Dodge. Remaining in Ft. Dodge affords the least amount of disruption in their

lives and provides them with an environment of familiarity and frequent contact with family member[s] in addition to maximum time with the custodial parent.

Chelsea appeals the decision to place physical care with Aundre.

We review the district court's physical care determination de novo. *In re Marriage of Hynick*, 727 N.W.2d 575, 577 (Iowa 2007). We give weight to the court's findings of fact, especially with regard to the credibility of witnesses, but we are not bound by them. *Id.*; Iowa R. App. P. 6.904(3)(g).

"The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). In making this determination, our controlling consideration is the best interests of the children. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). Iowa courts "have generally emphasized that the best interest of children is promoted by stability and continuity." *Hansen*, 733 N.W.2d at 691.

Chelsea argues certain factors make her the more suitable parent to provide physical care.[1] First, Chelsea asserts she has historically been the children's primary caretaker, especially when the children primarily lived with her between November 2018, when the parties separated, and August 2020, when the court entered a temporary order for joint physical care. "[C]ourts have typically afforded weight to the parent who has acted as the child's primary caretaker in the past."

---

[1] To the extent Chelsea argues for joint physical care, we agree with the district court that the distance between the parties makes joint physical care impracticable and not in the children's best interests. *Accord Thorpe v. Hostetler*, 949 N.W.2d 1, 6 (Iowa Ct. App. 2020) ("Because the parents now reside an hour drive apart, the shared-care arrangement is now unworkable and not in the best interests of the child.").

*Ruden v. Peach*, 904 N.W.2d 410, 414–15 (Iowa Ct. App. 2017). However, the record does not show Chelsea assumed an overwhelming share of the parenting duties. Both parents worked for much of the children's lives, requiring them to rely on others for childcare at times. While Aundre often worked two full-time jobs, he was an active caretaker when not at work. And Aundre had equal parenting time for the year prior to trial under the temporary order for joint physical care. Thus, Chelsea's history as primary caretaker has limited weight.

Second, Chelsea argues the court placed too much weight on Aundre's ability to watch the children during the day. She notes Aundre cannot watch the children on the nights he works, meaning he will still rely on someone else for childcare while the children are with him. However, Aundre only works seven of every fourteen days, and his overnight shifts mean the children will be asleep for most of the time he is at work. Thus, Aundre will only need someone else to provide childcare on half the nights the children are in his care; even on those worknights, the children will only need an active caregiver for a few hours between the time Aundre leaves for work and the time the children go to sleep. Furthermore, Aundre's fiancé will typically provide this childcare in the couple's home, the same home the children have lived in for most of their lives. Thus, we agree with the district court that Aundre's ability to watch the children during the day is a factor in his favor.

Third, Chelsea argues Aundre's fiancé—who will spend considerable time with the children—has significant "character flaws." She notes the district court found Aundre's fiancé was not "truthful during her testimony." On our review of the transcript, Aundre's fiancé made claims about her education, employment, and

medical history that are difficult to credit. She often claimed to forget key facts, avoided clarifying questions, and refused to produce documents that could support her claims. We find her entire testimony lacking in credibility. In addition, she acknowledged her driver's license was barred at one time, and we cannot accept her claim that she now has a valid license. However, Aundre—not his fiancé—is the parent at issue here. While Aundre's seeming acceptance of his fiancé's character flaws gives us pause, the record shows she is appropriate with the children. Chelsea acknowledged the children like Aundre's fiancé, and she could not point to any reason Aundre's fiancé could not take care of the children other than vague concerns "about her mental status." While Aundre has the children, he will be their primary caregiver during the day and the nights he does not work. The record supports that he has been an active and involved parent. His fiancé's active time as sole caregiver will be limited to a few hours each worknight between Aundre leaving for work and the children going to sleep. As to the fiancé driving the children, Aundre told Chelsea over text about one month prior to trial that the fiancé would no longer transport the children, and family in the area should be able to help transport the children as needed while Aundre is at work. Thus, while we share Chelsea's concerns with the fiancé, we do not believe these concerns are determinative.

Chelsea's overarching argument is she wants stability and continuity for their children. To that end, she also notes their children are bonded with T.C., who remains in her care. Iowa courts have "a strong interest in keeping" siblings and half-siblings together when making physical-care determinations. *In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986). *But see In re Marriage of Brauer*, 511

N.W.2d 645, 647 (Iowa Ct. App. 1993) (finding the child's best interests are served by placing physical care with the mother despite the father having custody of a half-sibling). While the district court's decision separates the parties' children from T.C. for much of the time, the children now have another half-sibling in Aundre's home. Furthermore, Aundre has acted like a father to T.C. for much of the child's life, and the parties agreed on T.C. having regular visitation with Aundre. Thus, the parties' children will still have frequent contact with T.C. even when the children are in Aundre's care.

This is a close call. The parties are both fit parents. Chelsea's arguments are not without substance. However, we ultimately agree with the district court. The record does not show either party is the superior parent. With this important consideration at equipoise, we look to the provision of stability and continuity for the children. Here, the scale tips toward Aundre. Placing the children with him will allow them to live in the same home surrounded by familiar friends and extended family while they continue to visit the same medical providers and attend the same schools. We think this will best ameliorate impact of the parties' separation on them. We affirm the court's decision to place physical care of the children with Aundre.[2]

---

[2] To the extent Chelsea also appeals the child support determination, she appears to argue we should use the parties' net incomes as they were measured at the time of the temporary support order. She presents no argument to deviate from the parties' net incomes at the time of the permanent support order. *See In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991) (stating the child support guidelines begin with the parents' "current net monthly income"). Thus, we reject any challenge to the child support determination.

Aundre requests appellate attorney fees. "An award of attorney fees is not a matter of right, but rests within the court's discretion and the parties' financial positions." *Brauer*, 511 N.W.2d at 647. "We are to consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *Id.* After accounting for the child support payments, both parties have similar net incomes. We decline to award appellate attorney fees.

**AFFIRMED.**