# IN THE COURT OF APPEALS OF IOWA

No. 19-1458
Filed April 29, 2020

**DYLAN BARTZ,**
        Plaintiff-Appellant,

**vs.**

**GINA M. MCDONALD,**
        Defendant-Appellee.
_____

Appeal from the Iowa District Court for Bremer County, Gregg R. Rosenbladt, Judge.

A father appeals a custody decree placing the parties' two children in the mother's physical care. **AFFIRMED.**

Lana L. Luhring of Laird & Luhring, Waverly, for appellant.

Heather A. Prendergast of Roberts, Stevens & Prendergast, PLLC, Waterloo, for appellee.

Considered by Tabor, P.J., and May and Greer, JJ.

**TABOR, Presiding Judge.**

Dylan Bartz appeals the district court order granting Gina McDonald physical care of their two children. He contends he can better minister to the children's long-term needs. Because the relevant factors weigh in favor of Gina having physical care, we affirm the district court.

## I. Facts and Prior Proceedings

Dylan and Gina are the unmarried parents of two boys—C.B., born in 2012, and K.B., born in 2014. Dylan also has an adult son. At the time of the custody hearing, Dylan was forty-years old, and Gina was thirty-nine.

Gina and Dylan began dating in 2011. For a time, they lived together in a house Gina owned in Waterloo. Eventually, they moved to the smaller community of Readlyn. Dylan contributed to the household funds, but Gina paid all the bills and managed the finances. They lived together until 2016. After splitting up, they entered into a voluntary shared-care agreement. The arrangement was one-week-on, one-week-off for each parent. In 2018, Gina moved to the Des Moines area. Dylan filed for a custody decree and, in a temporary order, the court placed the children in his physical care.

Dylan is a welder in Shell Rock. He works Monday through Friday, from 6:00 a.m. to 2:30 p.m. He carries employer-provided health insurance for the children. Dylan lives with his girlfriend, Leslie, and her three school-aged children, who spend fifty percent of their time with her. He and Leslie bought a four bedroom house together. C.B. and K.B. share bunk beds at Dylan's house, and get along well with Leslie's children.

Because of Dylan's early hours, Leslie gets the children ready for school. Dylan picks them up after school. The children attend daycare in Readlyn with an in-home provider, Debra. C.B. started going to Debra's about three years ago. At the time of the hearing, C.B. attended kindergarten in the Wapsie Valley district. After school, he joined his little brother, K.B., at Debra's home. K.B. and C.B. get along well.

C.B. has Down Syndrome. He needs regular medical testing and monitoring for endocrine, skeletal, cardiovascular, and weight issues. Dylan and Gina agree that, historically, Gina has managed C.B.'s scheduling and treatment. Dylan testified this division of labor occurred because Gina is "controlling." In the same vein, Dylan's girlfriend, Leslie testified Dylan was a "hands-on" parent. But she described Gina as rigid and unable to compromise.

Rejecting these characterizations from Dylan and Leslie, the district court found, "Gina is very organized and detail-oriented, and does a very good job monitoring C.B. and keeping track of his needs and appointments."

Gina works in business management and has a history of consistent promotions. From 2007 until August 2018, she worked at Rada Cutlery, a manufacturing company in Readlyn. After her split from Dylan, she dated Douglas. Douglas moved to Des Moines in May 2018. That summer, Gina applied for jobs in the Des Moines area and received an offer from National Car Wash Solutions. After negotiating a $21,000 raise and other benefits, Gina took the offer.

Then Gina moved to Des Moines and enrolled the children in daycare. But when Dylan petitioned for custody, the court entered a temporary order placing physical care with him. So the children returned to their previous daycare and

school in Readlyn. Gina had three weekends of visitation each month. She bought a house and researched schools and other special-needs resources for C.B. in the Des Moines area. Gina's boyfriend, Douglas, testified he and Gina took their relationship slowly in deference to Gina's children. Douglas has no children of his own. He first worked as a production supervisor at Titan Tire, then started a new job at Eagle Iron Works. He lives with Gina in Des Moines.

Several other witnesses testified in support of Gina, praising her parenting abilities and work ethic. Dylan agreed Gina is a good parent. Dylan also had witnesses speak on behalf of his parenting skills. When asked to describe Dylan's parenting, Gina testified he was "laid back" and a more "go-with-the-flow" type.

Gina expressed concerns about C.B.'s progress on his individualized education plan (IEP). C.B.'s teacher testified he repeated preschool[1] but was on track to advance to first grade. C.B. had forty-five minutes of individualized special education each day. And both a speech therapist and occupational therapist visit him at school. The teacher believed C.B.'s academic performance was improving, though he was not meeting some goals in his IEP. Overall, the teacher was pleased with his progress. Gina was in contact with the teacher and asked appropriate questions about C.B.'s progress. The teacher noted his IEP would transfer to a new school district.

The court held a custody trial in April 2019. After hearing from the witnesses, the court granted the parents joint legal custody. The court awarded physical care to Gina and liberal visitation for Dylan. Dylan appeals.

---

[1] The teacher testified the repetition was more for social development than academic reasons.

## II. Scope and Standard of Review

The district court tries custody matters in equity so we review the proceedings de novo. Iowa R. App. P. 6.907. We give weight to the district court's fact findings, but we are not bound by them. *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016).

## III. Analysis

Dylan complains about Gina's actions before his custody petition. As we see them, his contentions boil down to a request for physical care. In deciding which parent should have physical care, we consider the factors in Iowa Code section 598.41(3) (2018).[2] *See* Iowa Code § 600B.40(2); *Ruden v. Peach*, 904 N.W.2d 410, 414 (Iowa Ct. App. 2017). The parents agree joint legal custody is appropriate, but joint physical care is impossible because of the distance between Readlyn and Des Moines. *See In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007). "Once it is decided that joint physical care is not in the best interests of the children, the court must next choose which caregiver should be awarded

---

[2] That statutory list includes:

   a. Whether each parent would be a suitable custodian . . . .

   b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.

   c. Whether the parents can communicate with each other . . . .

   d. Whether both parents have actively cared for the child before and since the separation.

   e. Whether each parent can support the other parent's relationship with the child.

   . . . .

   h. The geographic proximity of the parents.

   i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody . . . .

Iowa Code § 598.41(3).

physical care." *In re Marriage of Hansen*, 733 N.W.2d 683, 700 (Iowa 2007). We base our determination on section 589.41(3) and the *Winter* factors.[3] *See In re Marriage of Winter*, 223 N.W.2d 165, at 166–67 (Iowa 1974).

When resolving physical care issues, we do not look to "perceived fairness" for the parents, but "what is best for the child[ren]." *Hansen*, 733 N.W.2d at 695; *see also Winter*, 223 N.W.2d at 166 ("It is not a matter of reward or punishment." (quoting *In re Marriage of Bowen*, 219 N.W.2d 683, 687 (Iowa 1974)). We seek to "place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695. In other words, the question is "who can minister more effectively to the long range best interest[s] of the child[ren]." *In re Marriage of Kunkel*, 555 N.W.2d 250, 253 (Iowa Ct. App. 1996).

---

[3] That list includes:

> 1. The characteristics of each child, including age, maturity, mental and physical health.
> 2. The emotional, social, moral, material, and educational needs of the child.
> 3. The characteristics of each parent, including age, character, stability, mental and physical health.
> 4. The capacity and interest of each parent to provide for the emotional, social, moral, material, and educational needs of the child.
> 5. The interpersonal relationship between the child and each parent.
> 6. The interpersonal relationship between the child and its siblings.
> 7. The effect on the child of continuing or disrupting an existing custodial status.
> 8. The nature of each proposed environment, including its stability and wholesomeness.
> . . . .
> 12. Any other relevant matter the evidence in a particular case may disclose.

*Winter*, 223 N.W.2d at 166–67.

Top of mind for Dylan is his original agreement with Gina that they would raise their children in Readlyn. He emphasizes that even after their separation, the parents selected a shared-care plan based on the children attending school and daycare in that community. Dylan reads Gina's move to Des Moines as defaulting on their agreement on the children's best interests. He expresses disappointment in Gina's change of plan. But he cites no authority that their voluntary agreement should carry any presumptive status. True, the conditions of the prior arrangement are relevant to the stability and continuity of the children's care. Taking it a step further, Dylan believes that factor weighs in favor of the children remaining in Readlyn. But we see other aspects to the stability-and-continuity question. What Dylan and Gina once agreed was in the children's best interests may no longer be in their best interests. When parties submit their custody dispute to the courts, they place the best-interests determination in the judge's hands.[4]

## A. Stability and Continuity of Care

Both Dylan and Gina are capable parents. After our de novo review of the record, we agree with this district court assessment: "there are no safety concerns for the children in the care of either parent." Both parents have stable jobs and can provide a healthy environment for the children. Both parents have good

---

[4] While parents are presumed to be in a better position to know the needs of their children, the district court "retains the ultimate decision making power and can find [an] agreement not to be in the child[ren]'s best interests. Parents do not have the power to bargain away the child[ren]'s rights." Child Custody Prac. & Proc. § 4:7 (Agreement of parents) n.2 (collecting cases).

relationships with the children. But we must still determine in which parent's care the children will fare better in the long-run.

The district court decided that parent was Gina. The court held Gina was more involved and capable of organizing the children's appointments and attending to their medical and educational needs. In fact, the court found, "[T]he evidence is overwhelming that Gina's skills in those areas are better."

Gina testified she has taken the lead in addressing the children's medical and educational concerns, especially C.B.'s special needs. Dylan agreed Gina usually took care of medical appointments but asserted he had become more involved since the temporary order placed the children in his physical care. He also blamed Gina's "controlling" nature for the situation.

But the district court did not see it that way. It found Gina's conduct did not "reach the level of nitpicking, micromanagement, and interference with the other parent's role or parenting time." We also see little evidence that Gina wielded her organizational skills in a negative way. Gina admitted to being a meticulous individual with a strong work ethic—her record of steady employment and jumps up the career ladder support that characterization. Her talents have also benefited the children, especially C.B., who is doing well medically and improving academically. He will continue to have medical needs and require testing and check-ups in Iowa City and Des Moines. It weighs in Gina's favor that she has been diligently seeing to C.B.'s needs while Dylan has taken a more "laid back," backseat role.

Dylan claims that Gina minimizes his parenting contributions, urging it is common for parents to divvy up responsibilities. *See, e.g.*, *Van Gundy v. Bolton*,

No. 18-1838, 2019 WL 2145848, at *3 (Iowa Ct. App. 2019) (finding families often delegated certain tasks to one parent and noting "the parent assuming physical care will be required to assume duties previously delegated to the other parent"). Crediting his claim, we do not label either parent as the "primary caretaker" under their voluntary shared-care arrangement. *See Hansen*, 733 N.W.2d at 696 (finding stability and continuity factors tend to favor the parent who has historically had primary responsibility for the children's physical care). We recognize parents split up duties. But Gina's greater familiarity with the medical history and ongoing demands of their special-needs child weighs in favor of granting her physical care.

Dylan refutes the notion that Gina will be a more vocal advocate for the children's medical and educational concerns. To bolster his position, Dylan presented testimony from family members and teachers noting C.B. has made cognitive progress while in Dylan's physical care. C.B.'s teacher expressed satisfaction with his academic progress and concern about C.B. moving to a bigger school district with less personal attention.

Weighing both parents' involvement in their children's educational paths, we find a near equal balance—with a slight tip in Gina's favor. Dylan alleges Gina was mistaken about some aspects of C.B.'s current academic status. Gina expressed concern C.B. wasn't keeping up with his IEP goals. His teacher felt he was making progress. But the teacher also testified Gina stayed in touch and posed appropriate questions on C.B.'s behalf. To her credit, Gina testified to investigating resources for special needs children in Des Moines. We agree with the district court that Gina is more proactive than Dylan in foreseeing challenges

for the children and seeking solutions.  This approach will serve both C.B. and K.B. well in the long-term.

Returning to geography, Dylan argues the children would enjoy greater stability by remaining in Readlyn with him.  He points out Debra has been their daycare provider for three years and should remain so.  But the boys' time in daycare will be less critical as they advance through primary school.  No question, children benefit from stability.  But stability can be nurtured by the physical-care parent even when the children live in a different part of the state.  *See In re Marriage of Jerome*, 378 N.W.2d 302, 305 (Iowa Ct. App. 1985) (recognizing the mobility of our society).

Plus, Dylan believes the children will benefit from staying in a smaller school district.  C.B.'s teacher testified C.B. was well integrated into his kindergarten class in Readlyn.  But she acknowledged his social skills would allow him to handle a transition.  She believed the Wapsie Valley district served C.B.'s needs.  But she acknowledged the small district had only one other student with Down Syndrome. In contrast, Gina testified to an array of resources available to children with special needs in the Des Moines area.  The district court found the children were too young to have integrated fully into the Readlyn community, so moving would not be too disruptive.  The court found any disruption was outweighed by positive factors associated with the move.  *See In re Marriage of Hoffman*, 867 N.W.2d 26, 36 (Iowa 2015) (finding record did not show children's educational interests dictated that they should stay in their original school district).  We agree.  The record shows Gina will ensure that both children thrive in their new surroundings.

On another aspect of stability, the district court worried about Dylan's tendency to delegate parenting duties to Leslie. Given Dylan's early work hours, Leslie prepares the children for school every morning. The court was reluctant to rely on Leslie's skills as a care provider because she is not necessarily a permanent fixture in their lives. Gina is the primary caregiver when the boys are with her. Gina's hours allow her to get them ready in the morning and pick them up after work, without relying excessively on Douglas. The court found both significant others were good influences on the children. But it declined to count on their continued presence when analyzing Dylan's and Gina's parenting. We agree Gina is better able to accommodate the children's day-to-day care in her schedule. Dylan and Gina quibble over some parenting decisions the other has made.[5] Like the district court, we do not find those incidents amount to an indelible black mark against either parent. We conclude Gina is the parent who can minister most effectively to the children's long-range best interests and bring them to physical, mental, and social maturity.

### B. Gina's Motivations

Dylan devotes a separate argument to Gina's motive for relocating. He asserts, "The timeline of Gina's move suggests it was done in haste to fulfill her personal desire to live near or with her boyfriend."

In the context of modification cases, we consider whether a parent's move was motived by a desire to undermine the other parent's visitation rights or overall

---

[5] For example, Gina was concerned about the children's progress in potty training and an incident involving C.B.'s eyeglasses; Dylan worries about Gina "babying" C.B. and that Gina could not attend a special awards ceremony for C.B.

relationship with the children. *See In re Marriage of Frederici*, 338 N.W.2d 156, 160 (Iowa 1983). If that analysis is relevant here, we find nothing in the record to suggest Gina moved to disrupt the shared-care arrangement with Dylan or to weaken his relationship with the boys. Gina testified to several motives for her move. The district court summarized,

> [T]he employment offered by National Car Wash Solutions to Gina was an attractive option for her, and the Court finds that it was much to Gina's advantage to accept this offer as a career advancement. This does not seem to be an impulsive situation on Gina's part. It involved a significant betterment for her career and salary, and also brought her closer to extended family in southwest Iowa.

No doubt, being near Douglas was another reason for Gina's move. But that motivation does not affect the physical-care calculus. *See In re Marriage of Behn*, 416 N.W.2d 100, 101 (Iowa Ct. App. 1987) (finding mother's moves with her new husband did not justify change in physical care). We do not fault Gina for pursuing career advancement. She did not use the move as an excuse to limit Dylan's parenting time.

### C. Support for Other Parent's Relationship with Children

Dylan next complains about Gina's "lack of regard for [his] right as a joint legal custodian" before entry of the temporary custody order. He faults Gina for moving to Des Moines and enrolling the children in school and daycare without consulting him. She also found new doctors and dentists for the children. Dylan claims these unilateral actions violated his custodial rights. We disagree. Text records between the parents show Gina tried several times to discuss her move with Dylan and was rebuffed. Like the district court, we find "Gina has demonstrated a good ability to co-parent with Dylan."

Because we find Gina edges out Dylan as the parent better able to minister to the children's long-term needs, we affirm the district court order granting her physical care. Dylan will maintain liberal visitation rights.

### D. Appellate Attorney Fees

Gina asks for appellate attorney fees. Iowa courts may award the prevailing party reasonable attorney fees in a proceeding to determine custody or visitation and on appeal from that proceeding. Iowa Code § 600B.26; *see Markey v. Carney*, 705 N.W.2d 13, 27 (Iowa 2005). The district court held the parties responsible for their own attorney fees. We do the same on appeal. Although Gina prevailed on appeal, we do not find Dylan is in a better financial position to contribute to her representation. But we do assess the costs of the appeal to Dylan.

**AFFIRMED.**