# IN THE COURT OF APPEALS OF IOWA

No. 19-1369
Filed September 23, 2020

**WENDY WHITAKER,**
        Plaintiff-Appellee,

**vs.**

**FREDRICK WIXOM,**
        Defendant-Appellant.

_____

        Appeal from the Iowa District Court for Lee (North) County, Wyatt Peterson,

Judge.


        A father appeals the decree granting the mother physical care of their child.

**AFFIRMED.**


        Scott E. Schroeder of Clark & Schroeder, PLLC, Burlington, for appellant.

        Ryan D. Gerling of Cray Law Firm, PLC, Burlington, for appellee.

        Reyna L. Wilkens of Wilkens Law Office, Fort Madison, attorney and

guardian ad litem for minor child.


        Considered by Vaitheswaran, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge.**

Fredrick Wixom appeals the decree awarding Wendy Whitaker physical care of their daughter. Fredrick contends he is in a better position to serve the child's long-term best interests. After considering the child's need for greater stability and continuity, we affirm the district court.

## I. Facts and Prior Proceedings

Fredrick and Wendy began dating in 2009. They lived together in Fort Madison during their relationship but never married. They have one daughter, L.W., born in 2011.[1] Wendy also has a son from a previous marriage, H.W., born in 2003. Fredrick and Wendy broke up when L.W. was three years old. After the separation, Fredrick moved to Jacksonville, Illinois, for work. Wendy stayed in Fort Madison with L.W. Despite the two-and-a-half-hour drive, Fredrick and Wendy agreed to share care of L.W. L.W. spent most weekends with Fredrick.

Fredrick married Tara in 2016. Tara owns a home in Chandlerville, Illinois. When Fredrick moved to Illinois, he had to register as a sex offender due to a sexual assault conviction from 1996. Because of that registration, Fredrick lives apart from Tara, whose home is located near a park. For the past several years, Fredrick has been living in an old church building, converted into a five-bedroom residence, with a roommate named Brett and Brett's family.

Tara lives with C.C. and K.C., her children from a previous relationship.[2] Fredrick testified that L.W. is close to C.C. and K.C. and calls them her brother and

---

[1] L.W. was seven years old at the time of the custody trial.
[2] C.C. was ten years old at the time of the trial, and K.C. was age fourteen. Tara has another son who is over eighteen.

sister. L.W. shares a bunk bed with C.C. if she stays at Tara's house. Besides L.W., Fredrick has eight other children, who have been in the physical care of their mothers for most of their lives.

Fredrick owes child support for L.W., as well as two other children. He does not currently work, so he is significantly behind in payments. Because of his child-support delinquency, Fredrick has been unable to secure a driver's license for more than ten years. Fredrick has had two jobs since moving to Illinois, each lasting three to four months. He was fired after his employers received anonymous calls informing them he was a registered sex offender. Fredrick believes either Wendy or her mother made the calls to sabotage him. But no evidence supports this allegation. Fredrick applied for several jobs before trial but did not receive any interviews, which he attributes to his sex-offender registration. He relies financially on Tara, who works full-time as a registered nurse. Fredrick testified that she makes enough money to support him and the children.

Because Fredrick does not work, he has more time to spend with the children. When L.W. is with him, Fredrick testified that they do homework, play board games, read books, and listen to music together. According to Fredrick, he tries to keep her away from electronics as much as possible. In his words, he and L.W. are "inseparable."

Wendy lives in Fort Madison with her mother and L.W. She works at Russell Cellular Verizon, usually less than forty hours a week. Before that, Wendy worked as a store manager at Check n' Go, which had better pay and more hours. But she testified she quit that job because she was worried Fredrick would use her busy work schedule against her at the custody hearing. Wendy testified she was

"intimidated" by Fredrick because he would threaten to involve his lawyer anytime they disagreed about L.W.

Since she was three years old, L.W. has lived primarily with Wendy. Without child support, Wendy pays expenses with her mother's help. L.W. has attended preschool and elementary school in Fort Madison. Wendy testified that she has regular conversations with L.W.'s teacher about how L.W. is doing in school. Wendy is also responsible for taking L.W. to doctor appointments.

Sometime in early August 2017, L.W. told Fredrick that her half-brother, H.W., had touched her inappropriately at Wendy's home, where both children lived. Fredrick alerted Wendy. When Wendy confronted H.W., he admitted two incidents occurred in summer 2015 (when H.W. was age twelve and L.W. was four). During an interview with the Illinois Department of Child and Family Services, L.W. recalled that H.W. touched her inappropriately ten or more times. The Iowa Department of Human Services investigated the alleged sexual contact but could not confirm the allegations due to "a lack of information."

Shortly after the troubling discovery, Fredrick sought an order of protection to secure immediate physical care of L.W. The Illinois district court issued an emergency order after determining H.W. had sexually abused L.W. Under the protective order, neither Wendy nor H.W. could have contact with L.W. While the order was in place, L.W. lived in Chandlerville with Fredrick and Tara.

Near the end of August, Wendy petitioned for custody in Iowa, requesting physical care of L.W. Fredrick moved to dismiss the petition based on the Illinois protective order. But the Illinois court removed the order on jurisdiction grounds. In November, the Iowa district court granted Wendy temporary physical care. The

court emphasized that Wendy could not allow H.W. to have any contact with L.W. Since then, H.W. has been living with his father.

The temporary order granted Fredrick liberal parenting time with L.W., including three weekends per month and holidays. The order also contemplated that L.W. would spend most of her 2019 summer break with Fredrick if the court had not entered a permanent decree by then. This arrangement increased tensions between Fredrick and Wendy, and their ability to co-parent deteriorated.

A major point of contention surrounded L.W.'s use of electronics. Wendy had given L.W. one of her old cellphones to let her watch YouTube and play games. Fredrick testified that L.W. would bring the cellphone every time she visited though he would not allow her to have one. During one of these visits, Fredrick came across a sexually explicit video of L.W. on her phone. He testified that Tara viewed the contents more closely because it was too difficult for him. Tara found several other alarming videos, as well as photographs, on the phone. The videos could be traced to different times when L.W. was in Fredrick's care and when she was in Wendy's care. One of them involved inappropriate activity between L.W. and Tara's daughter, C.C. When asked, Fredrick denied knowing much about that incident, claiming Tara and Wendy addressed it with the girls. Wendy testified she no longer allows L.W. to use the cellphone without adult supervision and also restricts her camera access.

Both L.W. and H.W. started therapy shortly after the sexual abuse came to light. L.W. meets with a child therapist, Denise Loveland, every two weeks in Jacksonville, a location chosen when L.W. lived with Fredrick under the protective order. Wendy testified that she schedules the appointments most of the time and

must drive more than two hours to take L.W. there. Sometimes Wendy has had to cancel because of poor weather or work.

H.W.'s therapist testified that although he showed progress, the therapist was still concerned about L.W. being left alone with H.W. The parties offered conflicting testimony about whether H.W. had contact with L.W. since the November 2017 order. According to Loveland, L.W. said she saw H.W. twice in the summer of 2018. The first time, L.W. said she had been sleeping at Wendy's house when she awoke to H.W. standing next to the bed. The second time, L.W. recalled H.W. was at Fun City waterpark when she went there with Wendy. Although Wendy had L.W. in her care two weekends that summer, Wendy denied H.W. being with them.

Loveland testified L.W. started having panic attacks after allegedly seeing H.W. that summer. Loveland diagnosed L.W. with post-traumatic stress disorder because she had reoccurring nightmares and trouble sleeping. After receiving a recommendation from L.W.'s primary doctor, Wendy started giving L.W. melatonin to help her sleep. This was another point of contention with Fredrick, who refuses to do the same because he believes melatonin can cause premature puberty. When L.W. is at Wendy's house, she usually sleeps with Wendy because she doesn't like to sleep alone. On the other hand, Fredrick testified that L.W. sleeps in her own room and has never had problems going to sleep at his house.

The district court held a two-day trial in November 2018 to determine physical care of L.W. An additional day was needed, so trial ended in January 2019. After reviewing all of the evidence, the court awarded physical care to Wendy and liberal visitation to Fredrick. Fredrick appeals.

## II. Scope and Standard of Review

The district court tries custody matters in equity, so we review the proceedings de novo. Iowa R. App. P. 6.907. We give weight to the district court's fact findings, but we are not bound by them. *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016).

## III. Analysis

## A. Physical Care

Because of the distance between Chandlerville and Fort Madison, joint physical care is impossible. *See In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007). "Once it is decided that joint physical care is not in the best interests of the child[ ], the court must next choose which caregiver should be awarded physical care." *In re Marriage of Hansen*, 733 N.W.2d 683, 700 (Iowa 2007). Fredrick argues the district court improperly granted physical care to Wendy. He asserts he is in a better position to supervise and protect L.W. in the long term.

In determining physical care, we consider the factors in Iowa Code section 598.41(3) (2017),[3] as well as the *Winter* factors.[4]  *See* Iowa Code § 600B.40(2); *Ruden v. Peach*, 904 N.W.2d 410, 414 (Iowa Ct. App. 2017); *see also Winter*, 223 N.W.2d at 166–67.

---

[3] Some of the relevant statutory factors include:
   a. Whether each parent would be a suitable custodian for the child.
   b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
   c. Whether the parents can communicate with each other regarding the child's needs.
   d. Whether both parents have actively cared for the child before and since the separation.
   e. Whether each parent can support the other parent's relationship with the child.
   f. . . . .
   h. The geographic proximity of the parents
   i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody . . . .

[4] The *Winter* factors include:
   1. The characteristics of each child, including age, maturity, mental and physical health.
   2. The emotional, social, moral, material, and education needs of the child.
   3. The characteristics of each parent, including age, character, stability, mental and physical health.
   4. The capacity and interest of each parent to provide for the emotional, social, moral, material, and educational needs of the child.
   5. The interpersonal relationship between the child and each parent.
   6. The interpersonal relationship between the child and its siblings.
   7. The effect on the child of continuing or disrupting an existing custodial status.
   8. The nature of each proposed environment, including its stability and wholesomeness.
      . . . .
   12. Any other relevant matter the evidence in a particular case may disclose.

*In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).

When resolving physical-care disputes, our primary consideration is the best interests of the child. *Hansen*, 733 N.W.2d at 695. We do not focus on the "perceived fairness" to the parents. *Id.* Instead, we seek "to place the child[ ] in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* In other words, we must determine which parent can minister more effectively to the long-range best interests of the child. *In re Marriage of Kunkel*, 555 N.W.2d 250, 253 (Iowa Ct. App. 1996).

As his primary push, Fredrick challenges Wendy's ability to supervise and to protect L.W. from future harm. Fredrick argues that Wendy has not prioritized the child's physical and mental health, and that her only goal is "to have H.W. return home." He also contends Wendy hasn't taken steps to limit L.W.'s unsupervised access to her phone despite L.W's past exposure to sexual content. Although we appreciate Fredrick's concerns, our de novo review of the record does not show that L.W.'s health and safety is jeopardized in Wendy's care.

We agree with the district court that it is clear both parents "genuinely care for and love their child." It is equally clear serious concerns arose over the parents' supervision of their child. After hearing evidence from both sides, the court decided that Wendy embraced the need for closer supervision and was more capable of remedying these "past issues in a way that will best serve the long-term interests" of L.W.

When we consider the key factors de novo, we reach the same physical-care determination as the district court. The need for greater stability and continuity in promoting L.W.'s development weighs in favor of Wendy. *See Hansen*, 733 N.W.2d at 696 (finding factors of stability and continuity favor the

parent who "was primarily responsible for physical care"). She has been L.W.'s primary caretaker since she was three years old. L.W. has lived in Fort Madison her entire life and has attended preschool and elementary school there. The parties agree L.W. was doing well in school, in great physical health, and overall happy. Wendy also encourages the bond between L.W. and Fredrick.

Because Fredrick is significantly behind on child-support payments, Wendy has paid for most of L.W.'s day-to-day necessities. Although Fredrick has shown interest in L.W.'s educational and medical needs, he relies entirely on Tara to meet them. Without a license, Fredrick is unable to drive L.W. anywhere that she needs to go. As the court found: "By himself, [Fredrick] does not have the capacity to provide for the material needs of the child."

Fredrick claims L.W.'s mental health would be at risk in Wendy's care because Wendy has not been involved in the children's therapy. We disagree. Although Fredrick initiated finding a therapist for L.W., Wendy has driven L.W. to most of her appointments despite the long distance to Jacksonville. Even if Wendy had to cancel at times due to work conflicts or weather conditions, we see little evidence that she has not prioritized L.W.'s mental health. Fredrick also points to Wendy's lack of involvement with H.W.'s counseling. But Wendy testified that she does not monitor H.W.'s appointments because H.W. has been living with his father since the abuse came to light. This choice further shows that Wendy's focus and attention has been on L.W.

As the district court found, both parents had room to improve when it came to supervising L.W. Fredrick argues L.W. is safer in his care because he has more time to look after her. But the record refutes his argument. The videos on L.W.'s

phone revealed that some of the inappropriate activity took place in Fredrick's home, including the incident between L.W. and Fredrick's stepdaughter, C.C. Despite the concerning nature of the video, Fredrick minimized the potential issues surrounding that incident.

After considering the evidence and applying the statutory and *Winter* factors, we agree with the grant of physical care to Wendy. To resolve conflicting testimony, the district court made observations about the witnesses' demeanor. The court found Wendy to be credible when she explained her efforts to address the situation between H.W. and L.W. and to monitor L.W.'s electronics use. We agree Wendy has taken L.W.'s mental health seriously and understands the need for increased supervision.

We also share the district court's concerns that "placing the child with [Fredrick] given his history of instability, lack of child support payments, lack of employment, and lack of raising any of his other children runs too big of a risk when concerning the long-range interest of the child." True, Fredrick has made significant efforts to support L.W. emotionally. But we are not convinced that he is able to provide a long-term stable environment. Like the district court, we find no reason to disrupt L.W.'s current living situation, as Wendy has consistently met L.W.'s physical, financial, and emotional needs. We conclude Wendy will minister most effectively to L.W.'s long-term best interests and bring her to social maturity.

## B. Appellate Attorney Fees

Both parties ask for appellate attorney fees. Iowa courts may award the prevailing party reasonable attorney fees in a proceeding to determine custody and on appeal from that proceeding. Iowa Code § 600B.26; *see Markey v. Carney*,

705 N.W.2d 13, 27 (Iowa 2005). Our controlling consideration is the parents' respective abilities to pay. *See In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013). After considering the financial circumstances of both parties, we decline to award appellate attorney fees. Although Wendy prevailed on appeal, Fredrick lacks the resources to pay for her representation. We assess the costs of this appeal to Fredrick.

**AFFIRMED.**