# IN THE COURT OF APPEALS OF IOWA

No. 22-0744
Filed January 25, 2023


**DEAUNTRE WILL SMITH,**
    Petitioner-Appellee,

**vs.**

**JESSIKA NICOLE CHESMORE,**
    Respondent-Appellant.
_____


Appeal from the Iowa District Court for Muscatine County, Tamra Roberts, Judge.


A mother appeals from a district court order granting the father sole legal custody and physical care of their daughter. **AFFIRMED AS MODIFIED.**


Eric D. Puryear and Eric S. Mail of Puryear Law P.C., Davenport, for appellant.

Jeannette Keller of Bowman, DePree and Murphy, LLC, West Liberty, for appellee.


Considered by Ahlers, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

Six-year-old Z.A.S. was born during what her father, DeAuntre Smith, said was a toxic relationship with her mother, Jessika Chesmore. Though their relationship ended, the toxicity continued, leading to the district court's decision to place Z.A.S. in Smith's sole legal custody and physical care. Chesmore appeals, claiming the court should have (1) granted the parties joint legal custody as they agreed; (2) adopted the parties' stipulated visitation schedule; and (3) placed Z.A.S. in her physical care. We affirm as modified.

## I.    Background Facts and Proceedings

Smith and Chesmore's relationship began in 2015, when Chesmore was pregnant with another man's child. The couple moved in together after about two months of dating. Smith said their relationship was good at first but soon soured. They started having arguments "out of nowhere," according to Smith. One of those arguments led to Smith being arrested for domestic abuse assault and displaying a dangerous weapon. He pled guilty to the weapons charge and spent twenty-five days in jail. When Smith was released, he moved back in with Chesmore and her older child. Chesmore's baby was born soon after.

The next year, Chesmore gave birth to the couple's child, Z.A.S. They continued to live together until the end of March 2018 when Smith moved to Minnesota. In the months before his move, Smith said they were arguing more. Chesmore was saying insulting things about his older daughter from a different relationship, calling her obese and "super fat." And she called Smith racial slurs. The tipping point for Smith was when Chesmore bought two guns and told him "that she could easily claim that she was scared of him, shoot him, and then she

would get away with it because he was a black man." So Smith said that "[h]e ran" to Minnesota where his family lived, leaving Z.A.S. behind. Smith explained that he didn't take Z.A.S. with him because "it would have been more hell to pay . . . . [S]he would have put some extra charges on me, said I would have done something way different than what was going on."

Chesmore sought a civil protective order against Smith after he moved to Minnesota. Smith said Chesmore alleged that he and his mother, who has chronic obstructive pulmonary disorder, tied her up and tried to take Z.A.S. with them. Even though her allegations were not true, Smith did not fight the protective order because he felt it was better to just stay away from Chesmore, explaining: "I'm scared what else [she was] going to say, you know, when I come to court and who's going to believe you?"

Smith stayed away for the next three years. During that time, Chesmore was the subject of three child abuse reports. The first was in 2018, when Z.A.S. tested positive for methamphetamine. That report was founded against an unknown perpetrator because the Iowa Department of Health and Human Services could not determine the source of the exposure. In 2019, Chesmore's boyfriend, Jordan, punched out the back window of a car during an argument, showering Z.A.S. and her half-sibling with shattered glass.

Then, in 2020, the department investigated a report that Chesmore was "using methamphetamines and/or was selling methamphetamines out of her home." One of Chesmore's children

> had seen some white substance on a scale, had seen Mom heat up something in a pan, and then started to smoke something out of a tube. She also had seen purchased baggies that Mom had put some

white stuff in, and her boyfriend at the time [Jordan] was seen selling stuff out of the home.

Jordan, who has a history of drug-related convictions and assaults, was arrested around the same time for a controlled-substance violation.

During its investigation, the department asked Chesmore to drug test, but she would not cooperate. As a result, the report was founded and a child-in-need-of-assistance petition was filed. Chesmore's oldest child was removed from her care and placed with that child's father, while her two youngest children remained in her care. This was conditioned on Chesmore not allowing any contact between Jordan and the children and providing negative drug screens.

The caseworker assigned to the family said Chesmore "was very resistive to services," describing her as "belligerent, argument[ta]tive, and disrespectful," though she did comply with drug testing. Chesmore "took no accountability for any of her actions and spent the majority of time focused" on others. According to the caseworker, "[t]here was absolutely no acknowledgment about any potential deficits in her parenting or a need to make some positive changes." She said that in her thirty years of experience as a social worker, she had "never worked with someone so uncooperative."

The caseworker had the opposite experience with Smith, who came back into Z.A.S.'s life after being notified of the juvenile court proceedings. She described Smith as open and honest, stating "he would acknowledge his flaws, he took accountability for some of his actions in his past, he was also very open to services . . . and wanted to make some changes." As a result, the department recommended that Smith begin supervised visits with Z.A.S. The day after this

recommendation was made, Smith and his girlfriend had a visit from the department's counterpart in Minnesota. According to Smith, the department "said they had a call stating that we were doing methamphetamine, doing cocaine, and drinking." Smith and his girlfriend let the worker into their home and "agreed to every test that they wanted us to take."

The record is unclear as to whether the recommended visits for Smith ever took place during the juvenile court case, which closed in July 2021 because Chesmore had been providing negative drug screens for six months. Soon after, Smith filed a petition in district court for joint legal custody and joint physical care of Z.A.S. Chesmore responded by moving to restrict Smith "from contact with all three of my minor children," Z.A.S. included, because of past domestic violence "as well as recent issues of threats of violence." In a separate proceeding for a civil protective order, Chesmore alleged that Smith made "threatening statements regarding kidnapping my child, burning our house down, and killing" her. That petition was dismissed for insufficient evidence, as was Chesmore's motion in the custody case.

In October, Smith moved for a temporary order to place the child in the parties' joint legal custody and begin gradual visitation between himself and Z.A.S. Chesmore resisted, characterizing Smith as "nothing more than a stranger to my daughter." She asked the court to deny "Smith any visitation or access to the minor child." The court rejected Chesmore's request after a hearing, placing the child into the parties' joint legal custody and ordering progressive visitation for Smith, which was to start in December and continue through January in Iowa. Starting in

mid-February, the visitation was to move to Smith's home in Minnesota. Smith was to also have video visits with the child twice each week.

By the time the case proceeded to trial in February 2022, Smith was able to have some, but not all, of his temporary visitation with Z.A.S. Chesmore did not make Z.A.S. available for Smith's visitation over the Christmas or New Year's holidays. And she did not bring the child to the exchange location when Smith's visits in Minnesota were to start. Smith said that Chesmore also made his video visits with the child difficult.

At the start of the trial, the parties informed the district court they agreed to joint legal custody and "a rough schedule" for visitation they would finalize "before we end for the day." But at the end of the day, Smith's attorney told the court "we still need to get you a stipulation regarding visitation." No such stipulation was filed before the court entered its ruling in April.

In that ruling, the court found that because the parties had "little to no ability to co-parent," Smith should be awarded sole legal custody. As far as the child's physical care, the court found Smith was better suited to provide for her needs. The court reasoned that although the child was with Chesmore

> longer and more continuous, [Chesmore] acted with wanton disregard toward her daughter's safety. There is strong evidence that drugs were being used and or sold out of her house, but she maintains that she has no knowledge of how one of her children could have tested positive for ingesting illegal substances. She has also continued to maintain a relationship with a man with a criminal history who is still on probation.

Chesmore appeals.

## II.    Standard of Review

We review orders establishing child custody de novo. *Thorpe v. Hostetler*, 949 N.W.2d 1, 4 (Iowa Ct. App. 2020).  We give weight to the court's fact findings, especially on credibility, given its exclusive ability "to listen to and observe the parties and witnesses."  *McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010).

## III.    Analysis

### A.    Legal Custody

Chesmore claims the district court disregarded the parties' agreement to place the child in their joint legal custody.  As a result, Chesmore argues the court's decision "violates Iowa's standards for notice pleading and [her] rights to due process."

"Our court has taken differing paths on this issue."  *In re Marriage of Beasley*, No. 21-1986, 2022 WL 16985437, at *5 (Iowa Ct. App. Nov. 17, 2022). Down one path, in *Bowlin v. Swim*, No. 19-1021, 2020 WL 2988537, at *5–6 (Iowa Ct. App. June 3, 2020), we found sole legal custody was properly before the court even though the mother's petition requested joint legal custody.  We reasoned the father was on notice that legal custody was at issue because the mother's proposed temporary order granted her sole legal custody, her answers to interrogatories stated that she was seeking sole legal custody, and she testified at trial, without objection from the father, that she wanted sole legal custody. *Bowlin*, 2020 WL 2988537, at *6.  We found similar circumstances persuasive in *Beasley*, 2022 WL 16985437, at *6, in finding the father was on notice that sole legal custody was at issue where the modification petition contained allegations

touching on legal custody, a pretrial order noted "child custody" was at issue, and the mother's proposed relief requested sole legal custody.

On the other path, in *Roszell v. Richards*, No. 09-1560, 2010 WL 2757186, at *3 (Iowa Ct. App. July 14, 2010), we found sole legal custody was not properly before the court where the mother's answer to the custody petition confirmed her agreement to joint legal custody. Similarly, in *Moses v. Rosol*, No. 21-1091, 2022 WL 949749, at *3 (Iowa Ct. App. Mar. 30, 2022), we agreed with the father that the district court should not have modified legal custody because the mother's petition "made no mention of modifying legal custody. Nor did her pretrial brief." And in a proposed disposition filed before trial, the mother stated the parties agreed to joint legal custody. *Moses*, 2022 WL 949749, at *3. We concluded that because the mother's "petition only sought a change in physical care, legal custody was not properly before the court even by notice-pleading standards." *Id.*

We find this case falls along the *Roszell* and *Moses* path. As in *Moses*, Smith's petition requested joint legal custody of the parties' child. More importantly, at the start of the trial, the parties informed the court they agreed to joint legal custody. *See* Iowa Code § 600B.40(2) (2021) (noting section 598.41 shall apply to "determining the visitation or custody arrangements of a child born out of wedlock"); *see also id.* § 598.41(4) (stating the factors in section 598.41(3) for determining custody "shall not apply when parents agree to joint custody"); *Roszell*, 2010 WL 2757186, at *3 ("[S]ection 598.41(4) . . . prioritizes the parents' agreement to joint custody. Because the parents agreed to joint legal custody, the district court erred in considering the factors in section 598.41(3)."); *In re Marriage of Daniels*, 568 N.W.2d 51, 58 (Iowa Ct. App. 1997) (Huitink, J., dissenting) (noting

the statutory scheme to decide whether sole custody is appropriate does not apply when parties have agreed to joint custody).  For these reasons, we modify the grant of sole legal custody to Smith to instead place the child in the parties' joint legal custody.

### B.     Physical Care

Chesmore next claims that Z.A.S. should have been placed in her physical care.  "The objective of a physical care determination is to place the child[] in the environment most likely to bring [her] to health, both physical and mentally, and to social maturity."  *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).  In determining the physical-care question, courts are guided by the factors set out in section 598.41(3), as well as those listed in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).  *See Hansen*, 733 N.W.2d at 698 (holding the factors enumerated in section 598.41(3) are relevant in making a physical-care determination).  The first and governing consideration of the courts, however, "is the best interests of the child."  Iowa R. App. 6.904(3)(o).  The factors that Chesmore highlights are the length of time the child was in her care, Smith's history of abuse, the nature of her home environment, and the child's bond with her half-sibling.

We typically afford "weight to the parent who has acted as the child's primary caretaker in the past."  *Ruden v. Peach*, 904 N.W.2d 410, 414–15 (Iowa Ct. App. 2017); *accord Hansen*, 733 N.W.2d at 696 ("[S]tability and continuity of caregiving are important factors that must be considered in custody and care decisions.").  But that factor is not dispositive.  *See Flick v. Stoneburner*, No. 15-1930, 2016 WL 2743449, at *2 (Iowa Ct. App. May 11, 2016).  A parent's historic

role as the child's primary caregiver can be outweighed where, for example, a parent has "not been adequately performing his or her responsibilities because of alcohol or substance abuse." *Hansen*, 733 N.W.2d at 697. Although Chesmore provided negative drug screens during the child-in-need-of-assistance proceedings, Z.A.S. was exposed to methamphetamine while in her care. There was also, as the district court found, "strong evidence that drugs were being used and or sold out of her house," with her oldest child witnessing some of that activity.

We recognize that Smith was absent from Z.A.S.'s life for an extended time, but he worked hard to reestablish their relationship, cooperating with the department during the juvenile court case and taking advantage of every opportunity for contact with Z.A.S. Chesmore worked equally as hard to limit Smith's role in the child's life by attempting to obtain a protective order prohibiting him from contacting Z.A.S., responding to Smith's motion for temporary visitation by asking that he be denied visitation, and then refusing to allow him some of the temporary visitation ordered by the court. *See* Iowa Code § 598.41(3)(e) (stating in determining what custody arrangement is in the best interest of a child, the court must consider whether "each parent can support the other parent's relationship with the child"); *In re Marriage of Will*, 489 N.W.2d 394, 399 (Iowa 1992) ("[T]he denial of one parent of the child's opportunity to have meaningful contact with the other parent is a significant factor in determining the custody or physical care arrangement.").

As far as Smith's "history of abuse," Chesmore's brief alleges that in 2015, before the parties' child was born, Smith "was charged criminally as a result of a domestic altercation where [her] head was injured." *See* Iowa Code § 598.41(3)(j).

The only evidence presented at trial on this issue was Smith's testimony, which Chesmore did not counter. Smith explained that during an argument with Chesmore, he "pushed her somewhere." And then he remembers "her leaving the room and [he] heard a big clash and she has . . . blood all over her head and face." Smith thinks that she hit her head intentionally and then "told some friends of hers and the police that [he] was swinging her around, grabbing her by her hair . . . and a whole bunch of extra stuff" that Smith says he did not do. When Chesmore came back with some of her friends after the argument, Smith said that he grabbed a pocketknife and told them to stay away. He pled guilty to a dangerous-weapons charge, the domestic abuse assault charge was dismissed, and the couple resumed their relationship. Chesmore also points to the default protective order she obtained against Smith after he moved to Minnesota, but she presented no evidence at trial about the allegations supporting the order. Given the evidence presented about these incidents at trial, we do not find them sufficient to establish a history of domestic abuse. *See In re Marriage of Forbes*, 570 N.W.2d 757, 760 (Iowa 1997).

We are more concerned with the nature of Chesmore's home environment. *See Winter*, 223 N.W.2d at 166 (considering the "nature of each proposed environment, including its stability and wholesomeness"). She has been investigated by the department three times for child abuse reports. Two of those reports involved methamphetamine, and one involved her boyfriend Jordan punching out the back window of a car while Z.A.S. and her half-sibling were in it. The last report involving methamphetamine was founded against Chesmore and led to juvenile court involvement. After that case closed, Chesmore resumed her

relationship with Jordan, who has a history of drug-related convictions and assaults. Because she is taking college classes full-time and is not working, Chesmore relies on Jordan to support her and her three children.

In contrast, Smith has been in a committed relationship with his girlfriend for the past four years. They live in a spacious two-bedroom townhome near a school with their two-year-old child and the girlfriend's older child, who is autistic. Smith's girlfriend stayed home with the children, while he worked as a direct support professional for the Minnesota Department of Human Services. In that job, Smith was subject to a background check and drug tests. Smith lost that job before trial because of the time he had to spend in Iowa to have visits with Z.A.S., but he expected that he could resume the work once the court proceeding was over. As the district court found, "[d]espite this disruption, [Smith] has built a home that is safe for children."

This leaves us with the bond Z.A.S. shares with her older half-sibling in Chesmore's care. Although there is a preference that siblings not be separated, that rule is not ironclad. *Will*, 489 N.W.2d at 398. Circumstances, including a parent's willingness to promote meaningful contact between the child and the other parent, "may arise which demonstrate that separation may better promote the long-range interests of children." *Id.* (citation omitted). We agree with the district court that Smith "recognizes the need for the child to have contact with siblings." He has a good relationship with the father of Chesmore's oldest child and testified that he "would do whatever" he could to promote contact between Chesmore and Z.A.S. As a result, we do not find the preference prevails here.

Having reviewed the record de novo, we agree with the district court that although Chesmore "clearly loves her child and has a bond with her, . . . after weighing all of the applicable factors, [Smith] is the better caretaker and should be awarded primary physical care." It is in the child's best interest to be placed in the physical care of Smith, who will be more likely to support her other relationships and bring her to healthy physical, mental, and social maturity. *See Hansen*, 733 N.W.2d at 695.

### C. Visitation

Because of the distance between the parties, the district court found that visitation between Chesmore and Z.A.S. needed to "be further apart, but for longer blocks of time." To achieve that, the court gave Chesmore eight weeks during the summer, as well as all of the child's fall and spring break, with the Christmas break to be evenly divided between the parties.

Chesmore claims the district court should have adopted the visitation agreed to by the parties at trial, which included alternating weekend visitation and video calls with the child twice each week. But the parties gave the court only a "rough schedule" for visitation, saying they would finalize it later, which they never did. *See Longnecker v. Raymundo*, No. 00-0452, 2001 WL 725474, at *2 (Iowa Ct. App. June 29, 2001) ("The district court clearly did not err in failing to adopt the schedule agreed to by the parties because such an agreement did not exist.").

Further, while liberal visitation is desired, *see In re Marriage of Stepp*, 485 N.W.2d 846, 849 (Iowa App. 1992), that directive is in the context of what "is reasonable and in the best interest of the child." Iowa Code § 598.41(1)(a). Given that the parties live a state apart, and their struggles with visitation during the

temporary proceedings, we find the in-person visitation schedule adopted by the district court is reasonable and in Z.A.S.'s best interest. *See Ryan v. Wright*, No. 17-1375, 2018 WL 2246882, at *4 (Iowa Ct. App. May 16, 2018) (considering geographic distance between parties in fashioning a visitation schedule). But because of the length of time between those visits, we conclude the court should have afforded the parent who is not exercising parenting time with the child to have video calls every Tuesday and Thursday. We accordingly modify the decree to provide that the parent who is not exercising parenting time with the child shall have a video call with the child every Tuesday and Thursday via Facetime, Skype, or other video service from 6:30 p.m. until 7:00 p.m.

## IV.     Conclusion

We modify the district court's grant of sole legal custody to Smith to instead place the child in the parties' joint legal custody. The court's decision to place the child in Smith's physical care is affirmed, as is its in-person visitation schedule, although we modify the decree to provide for video calls with the child. Costs on appeal shall be split equally between the parties.

**AFFIRMED AS MODIFIED.**