**IN THE COURT OF APPEALS OF IOWA**

No. 23-1281
Filed March 19, 2025

**MIGUEL ANGEL ZAMORA,**
        Petitioner-Appellee,

**vs.**

**GABRIELLE GONZALES,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Scott County, Joel W. Barrows,

Judge.


        Gabrielle Gonzales appeals the decree establishing custody, physical care,

visitation, and support of the child she shares with Miguel Zamora.  **AFFIRMED IN**

**PART, MODIFIED IN PART, REVERSED IN PART, AND REMANDED.**


        Garth M. Carlson of Gomez May LLP, Davenport, for appellant.

        Danielle A. Dunne of Carney & Appleby, P.L.C., Des Moines, for appellee.


        Considered by Badding, P.J., Langholz, J., and Doyle, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2025).

**DOYLE, Senior Judge.**

Gabrielle Gonzales appeals the decree establishing custody, physical care, visitation, and support of the child she shares with Miguel Zamora. She challenges the grant of physical care to Miguel Zamora. She also contests the requirement that she provide all transportation for visitation, the amount of child support, and the award of Miguel's trial attorney fees. Miguel requests an award of his appellate attorney fees.

**I. Background Facts and Proceedings.**

Gabrielle and Miguel lived together in the Quad Cities[1] when E.Z. was born in 2017. They separated about two months later.

Gabrielle moved to Woodhull, Illinois to live with her father—about thirty-five miles from the Quad Cities. She returned to the Quad Cities in March 2018, living at five residences over a period of four and one-half years. Since September 2022, Gabrielle has listed her father's Woodhull home as her permanent residence.

Gabrielle has another child, T.A., who was born in 2010. T.A. attends school in the Quad Cities, which is where his father lives. Gabrielle testified that

---

[1] The Quad Cities is the name used to refer to a group of cities that span the Iowa-Illinois border at the point where the Mississippi River flows from east to west. *See Geography, Quad Cities*, Wikipedia, https://perma.cc/7M9E-MU48. The main cities are Davenport and Bettendorf in Iowa and Rock Island, Moline, and East Moline in Illinois. *See Quad Cities*, Wikipedia, https://perma.cc/Q8PJ-B2SD. But the Quad Cities metropolitan area encompasses many smaller cities and towns located in Scott County, Iowa, and Henry, Mercer, and Rock Island Counties in Illinois. *See, e.g., Population by City, Quad Cities*, Wikipedia, https://perma.cc/MC5F-QWKL (listing sixty-three cities and unincorporated places that form the metropolitan area—five with populations over 10,000, eighteen with populations between 1000 and 10,000, and forty with populations under 1000). For ease of reading, we refer to all locations within these counties as the Quad Cities.

on weekdays, she stays with a friend in the Quad Cities to help transport T.A. to and from school. Gabrielle shares joint physical care of T.A. with his father, so T.A. stays with Gabrielle at her friend's home when Gabrielle has physical care. She takes T.A. and E.Z. to stay with her in Woodhull during weekends.

Gabrielle has worked mainly in the food service industry, earning a lower hourly wage plus tips. Her employment is typically part-time, but she has worked up to sixty hours per week between three jobs. She admits that she has changed employment often but explained that it is due to the nature of the industry:

> [It's r]eally hard to work around my schedule because a lot of things do come up for my kids and myself that managers aren't understanding of in the service industry. I've been in it a very long time, and I know that. A lot of times the managers are, you know, unethical. Sexual harassment is going on. Or a lot of times it's been conflict of schedule, like I said. They don't have gratitude towards, you know, what's family, what family stuff goes on, and to me, family is first. If I have to drop everything and go get, you know, [T.A.] or [E.Z.], that's what I'm gonna do.

Gabrielle has also taken classes at a community college and was enrolled in two classes at the time of trial.

After his relationship with Gabrielle ended, Miguel stayed in the Quad Cities and began a relationship with Michelle. Miguel and Michele married and had a child together. Michelle's two older children also live with them. Miguel also has three children from prior relationships who do not live with him.[2] Miguel testified that he has worked for his employer for eight and one-half years.[3]

---

[2] Miguel testified that the oldest was eighteen, one was about to turn seventeen, and the youngest was twelve or thirteen.

[3] The business is engaged in seasonal work. Miguel testified that his hours vary depending on the weather and sometimes he works more than forty hours per week. He does not work during the winter months.

Gabrielle and Miguel disagree about who acted as E.Z.'s primary caretaker in his early years. But after Miguel brought this custody action in 2020, the district court granted the parties joint physical care of E.Z. In January 2021, the court modified the order and placed E.Z. in Miguel's physical care, granting Gabrielle visitation one weekday evening per week and every other weekend.[4] The order makes Gabrielle responsible for providing transportation for visitation. After the court modified the order, Miguel moved to Bennett—about thirty-five miles from the Quad Cities and sixty-eight miles from Woodhull.

After a trial in June 2023, the court entered a decree placing E.Z. in Miguel's physical care. It granted Gabrielle visitation like that provided in the January 2021 order but extended the midweek visits to an overnight visit during the summer. The decree again makes Gabrielle responsible for transportation to and from the visits.

The decree also sets the amount of child support Gabrielle must pay to Miguel. The court found Gabrielle was underemployed and imputed to Gabrielle $21,000 of income. After calculating the amount due under the child support guidelines, the court ordered Gabrielle to pay $500.14 per month for child support. Finally, noting Gabrielle's lack of compliance with discovery during the proceedings and "her financial situation," the court ordered Gabrielle to pay $5000 of Miguel's attorney fees.

Gabrielle moved the court to reconsider and expand its ruling, which the court denied. Gabrielle appeals.

---

[4] Gabrielle was unrepresented at the hearing.

**II. Scope of Review.**

We review decrees for custody, visitation, and support de novo. *See Ruden v. Peach*, 904 N.W.2d 410, 412 (Iowa Ct. App. 2017); Iowa R. App. P. 6.907. "We examine the entire record and decide anew the legal and factual issues properly presented and preserved for our review." *In re Marriage of Wade*, 780 N.W.2d 563, 565-66 (Iowa Ct. App. 2010). We may give weight to the district court's findings, but they are not binding. *Ruden*, 904 N.W.2d at 412. This includes the court's credibility findings. *Id.*

**III. Physical Care.**

Although Miguel and Gabrielle were never married, we apply the provisions of Iowa Code section 598.41 (2020) in determining E.Z.'s physical care. *See* Iowa Code § 600B.40(2). Our goal is to determine which arrangement allows "maximum continuing physical and emotional contact with both parents." *Id.* § 598.41(1). In doing so, we consider the factors listed in section 598.41(3). Those factors include the suitability of each parent to be the child's custodian, the parents' ability to communicate about the child's needs, each parent's history of caring for the child, and each parent's ability to support the other parent's relationship with the child. *See id.* § 598.41(3)(a), (c), (d), (e). "Our overriding consideration is the best interests of the child." *McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010). "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).

The district court declined to grant joint physical care of E.Z., and we agree that such an arrangement would not serve E.Z.'s best interests. The distance

between the parties' residences makes joint physical care unfeasible now that the child attends school. And a joint-physical-care arrangement would prove difficult given the amount of conflict Miguel and Gabrielle display when communicating about E.Z.

Gabrielle challenges the decision to place E.Z. in Miguel's physical care. She contends that the parties' caretaking history favors her because she was primary caretaker during the first three years of E.Z.'s life. She also contends that Miguel does not promote a relationship between her and E.Z.

There is a dispute over the amount of caregiving each party provided during the first years of E.Z.'s life. A temporary order entered in June 2020 provided joint physical care. But after six months, the court modified the order to place the child in Miguel's physical care, where he remains. Even if we assume that Gabrielle was E.Z.'s primary caretaker until June 2020, Miguel has provided physical care for the past four years. The parties' caregiving history favors Miguel.

We agree that Miguel is better equipped to bring E.Z. to physical, mental, and social maturity. Miguel has a better history of stability in his employment and housing. Miguel is married to Michelle, and they have a child together. The three share a home with Michelle's two other children. Placing E.Z. in Miguel's physical care will allow E.Z. to continue daily contact with his half-sibling and two stepsiblings. In contrast, E.Z. would share a residence with T.A. only half the time as his father and Gabrielle share joint physical care.

Because E.Z.'s best interests are served by placing him in Miguel's physical care, we affirm the physical caretaking provisions of the decree.

**IV. Visitation.**

Gabrielle also challenges the provision of the decree that relates to visitation. She does not contest the visitation schedule itself. Rather, she challenges the requirement that she provides all transportation for visitation. Determining who is responsible for transporting children to and from visits depends on the facts of the case. *See In re Marriage of Disney*, No. 98-1915, 2000 WL 278543, at *2 (Iowa Ct. App. Mar. 15, 2000) ("There is no bright line rule for assigning the responsibility for transportation expenses to one or both parents. A resolution of the issue is largely fact-dependent.").

The district court ordered Gabrielle to "do the pick-up and drop-off of E.Z." for visits, citing "her history of transportation issues and rescheduling visitation at the last moment." The evidence shows that the biggest impediment Gabrielle had with transportation occurred when her vehicle was stolen, an incident she reported to law enforcement.[5] Even so, it is inequitable for Gabrielle to provide all transportation to and from visitation, especially when Miguel moved thirty-five miles away after the temporary order was modified in January 2021.

We agree that responsibility for transporting E.Z. to visits should be shared by both parties. *See In re Marriage of Worzala*, No. 09-1191, 2010 WL 2757127, at *1 (Iowa Ct. App. July 14, 2010) ("As noted, the district court held Andrew

---

[5] Miguel agreed to help with some of the transportation immediately after that event. But he testified that he "was kind of upset" by Gabrielle's requests to help with transporting E.Z. during that period because "[s]he got rides to work" and he "didn't know how she can just drive to work and not have a ride to bring her son back." Finding a one-way ride to work is significantly different than finding someone willing and able to drive her between seventy and one hundred and forty miles roundtrip to pick up or drop off a young child.

entirely responsible for the transportation costs. The court reasoned that Andrew chose to transfer to Georgia. We agree with the court's decision."); *In re Marriage of Bonnette*, 492 N.W.2d 717, 722 (Iowa Ct. App. 1992) (finding a provision splitting transportation expenses was fair and equitable). We therefore modify the decree to provide that each party is tasked with transporting E.Z. to the Quad Cities for exchanges at a mutually agreed upon place.

**V. Child Support.**

Next, Gabrielle challenges the amount of child support she is ordered to pay. We calculate child support using the child support guidelines. *See In re Marriage of Erpelding*, 917 N.W.2d 235, 245 (Iowa 2018); *accord* Iowa Code § 598.21B; Iowa Ct. R. 9.2. "The purpose of the guidelines is to provide for the best interests of the children by recognizing the duty of both parents to provide adequate support for their children in proportion to their respective incomes." Iowa Ct. R. 9.3(1). We include all income that is not irregular, uncertain, or speculative. *See In re Marriage of Nelson*, 570 N.W.2d 103, 105 (Iowa 1997).

To determine the amount of support the noncustodial parent must pay for a child, the court computes each parent's adjusted net monthly income by subtracting taxes and certain deductions from their gross monthly income. *See* Iowa Ct. R. 9.14(1). That includes a deduction for prior child support obligations paid under court or administrative order. *See* Iowa Ct. R. 9.14(1)(H).

The child support guidelines submitted by Miguel deduct $6012 from his gross annual income for child support paid to three children. Miguel submitted into evidence the orders for support for three children that equal this amount. But Miguel testified that one child turned eighteen and graduated high school, so "she's

no longer on the child support." The amount of child support Miguel paid for that child was $350 per month or $4200 per year. Removing the deduction for this amount of child support, Miguel's monthly adjusted income is $2823.91—not as $2473.91 determined by the district court.

Gabrielle also complains about the credit Miguel received for payment of health insurance premiums. Rule 9.14(5) provides an adjustment to the basic support obligation based on the child's portion of the health insurance premium the parents pay. How much of the health insurance premium a parent is credited for depends on who health benefit plan covers. *See* Iowa Ct. R. 9.14(5)(b). If the health benefit plan covers only the child in the pending action, the entire premium is used. *See* Iowa Ct. R. 9.14(5)(b)(2). But if it covers multiple individuals, including the child, we calculate the child's portion by subtracting the cost for single coverage from the total premium and dividing that amount by the number of individuals enrolled in the health benefit plan (excluding the person providing the insurance). *See* Iowa Ct. R. 9.15(5)(b)(1). The record shows that Miguel pays monthly premiums of $369 for "family medical" health plan, $58 for "employee/child" dental plan, and $16.28 for "employee/child" vision plan, which totals $443.28.[6] His child support guidelines worksheet lists the entire amount as the allowable child's portion of health insurance cost, but the designation of these plans as "family" or "employee/child" indicates that they cover more than just E.Z.

---

[6] Miguel's child support guidelines worksheet lists the child's allowable portion of health insurance cost as $443.29, $.01 higher, which we attribute to a scrivener's error.

Without evidence of who is covered or the cost for single coverage, we cannot discern the child's portion. This issue should be resolved on remand.

Finally, Gabrielle objects to the district court's decision to use her earning capacity rather than her actual earnings in determining her child support obligation. She argues the court erred by imputing this income to her without a written finding that using her actual earnings would lead to substantial injustice. *See* Iowa Ct. Rs. 9.5(1)(d)(2); 9.11(4).

Before imputing income based on a parent's earning capacity, the court must find a parent "is voluntarily unemployed or underemployed without just cause." Iowa Ct. R. 9.11(4). This determination "must take into consideration the specific circumstances of the parent," which includes employment potential, work and training history, qualifications, job opportunities, availability of employers willing to hire the parent, and community earnings. Iowa Ct. R. 9.11(4)(b). The court may consider "the parent's assets, residence, educational attainment, literacy, age, health, criminal record and other employment barriers, record of seeking work, and other relevant factors." Iowa Ct. R. 9.11(4)(c). Finally, to impute income to a party, the court must make a written determination "that, if actual earnings were used, substantial injustice would occur or adjustments would be necessary to provide for the needs of the child(ren) or to do justice between the parties." Iowa Ct. R. 9.11(4)(d). Although the district court concluded that Gabrielle is underemployed and attributed to her an annual income of $21,000, it did not find that using her actual earnings would result in substantial injustice.

On our de novo review, we disagree with the court's finding that Gabrielle is underemployed. Gabrielle testified to the difficulty of finding full-time

employment in the food service industry. She noted that it is especially difficult to find employers who are willing to accommodate her availability as a single mother.[7] Gabrielle testified that at one point, she held three part-time jobs to work a combined total of about sixty hours per week. But there is no evidence that such a schedule is feasible in the long term or that there are jobs offering hours that would make such a schedule feasible. Without evidence that Gabrielle could earn more and chooses not to, there is no basis for finding she is underemployed.

Even so, we do not find substantial injustice would occur using Gabrielle's actual earnings. At the time of trial, Gabrielle was paying temporary child support of $222.62 per month.[8] She quit one job because her pay after child support was withheld was too low to live on, and she stayed with her father and a friend rather than get her own place to save money. Still, Gabrielle testified that she was $1600 to $1700 behind on support payments at the time of trial. Gabrielle's affidavit of financial status shows that her debts outweigh her assets. Excluding child support, she estimated expenses of $1015.50 per month. To pay child support of $500.14 per month in addition to her monthly expenses, Gabrielle would need a net income of at least $18,187.68. Her 2021 W-2 forms show her gross income was only $17,648.41. In contrast, Miguel's 2021 gross income was $48,534.00. Given the discrepancies in the parties' income and circumstances, it is unnecessary to

---

[7] Gabrielle also testified that she lost work because of employers being unwilling to accommodate scheduled hearings in the underlying matter. Her enrollment as a part-time student also impacts her working hours.

[8] Because the record at the temporary hearing lacked the parties' earnings, the court imputed earnings of $15,080 to Gabrielle—the amount she would earn if working full-time at minimum wage in Iowa.

impute additional income to Gabrielle. We remand to the district court to recalculate the child support consistent with this opinion.

**VI. Trial Attorney Fees.**

Gabrielle challenges the award of $5000 in trial attorney fees to Miguel. "Generally, a party has no claim for attorney fees as damages in the absence of a statutory or written contractual provision allowing such an award." *Williams v. Van Sickel*, 659 N.W.2d 572, 579 (Iowa 2003). The legislature has authorized the district court to award attorney fees to the prevailing party in custody action. *See* Iowa Code § 600B.26. Whether the court awards attorney fees rests on the parties' abilities to pay. *See Christy v. Lenz*, 878 N.W.2d 461, 469 (Iowa Ct. App. 2016). We only disturb an award of trial attorney fees if the district court abuses its discretion. *Markey v. Carney*, 705 N.W.2d 13, 25 (Iowa 2005).

The district court ordered Gabrielle to pay part of Miguel's trial attorney fees based on "the procedural history of this case in terms of [her] compliance with discovery." Although a trial court can award reasonable attorney fees a party incurs in obtaining discovery answers, the purpose of such an award is to serve as a discovery sanction after a party moves to compel discovery. *See* Iowa R. of Civ. P. 1.517(1)(d) (authorizing the award of reasonable attorney fees as an expense incurred in obtaining an order compelling discovery). One day before trial, Miguel moved to compel discovery and continue trial; he asked for an award of attorney fees incurred in bringing the motion. Because the district court denied both the motion and the request for attorney fees for bringing it, it had no authority to award Miguel trial attorney fees on this basis and thus abused its discretion. Instead, an award of attorney fees in connection with a child custody action "must be . . . based

on the parties' respective abilities to pay." *In re Marriage of Hunt*, 476 N.W.2d 99, 103 (Iowa Ct. App. 1991). Given the disparity in the parties' earnings, we decline to award Miguel his trial attorney fees. We reverse the district court on this issue.

**VII. Appellate Attorney Fees.**

Finally, Miguel requests an award of his appellate attorney fees, which rests within this court's discretion. *See Markey*, 705 N.W.2d at 25-26. We consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request had to defend the district court's decision on appeal. *Id.* at 26. Gabrielle prevailed on three of the four issues she raised on appeal. For the same reasons stated in the preceding section, we decline to award Miguel his appellate attorney fees.

**AFFIRMED IN PART, MODIFIED IN PART, REVERSED IN PART, AND REMANDED.**